*441
 
 Opinion
 

 MOSK, J.
 

 This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (id., § 190 et seq.).
 

 On April 9, 1991, the District Attorney of Los Angeles County filed an information against Deondre Arthur Staten in the superior court of that county. The information charged that between October 12 and October 13, 1990, defendant murdered Arthur Staten, his father, and Faye Staten, his mother. (Pen. Code, § 187, subd. (a).) It was alleged for death eligibility that he did so under the special circumstances of (1) killing for financial gain and (2) multiple murder.
 
 (Id.,
 
 § 190.2, subd. (a)(1), (3).) It was further alleged that, in murdering his father, defendant personally used a firearm within the meaning of Penal Code section 12022.5, and that, in murdering his mother, he personally used a deadly and dangerous weapon, to wit, a knife
 
 (id.,
 
 § 12022, subd. (b)).
 

 Defendant pleaded not guilty to the charges and denied the allegations. Trial was by jury. The panel returned a verdict finding defendant guilty as charged of the murders of his father and mother and fixed the degree at the first. It found true the accompanying allegations of special circumstances of murder for financial gain and multiple murder. As to the murder of his father, it found that he personally used a gun; as to the murder of his mother, it found that he personally used a knife. It fixed the punishment for each murder at death.
 

 The superior court denied defendant’s motion for a new trial and his automatic application for modification of the verdict (Pen. Code, § 190.4, subd. (e)). For the murders, it imposed a sentence of death. For the use of the gun, it imposed a middle enhancement of four years; for the use of the knife, it imposed an enhancement of one year. It stayed execution of the sentences for gun use and use of a deadly weapon temporarily, pending execution of the sentence of death, and permanently thereafter. (Pen. Code, § 654.)
 

 As we shall explain, we conclude that we should affirm the judgment.
 

 I. Facts
 

 A.
 
 Guilt Phase
 

 The People introduced evidence to the following effect.
 

 Defendant, age 24, lived with his parents Arthur and Faye Staten in the La Puente/East Valinda area of Los Angeles County. Arthur and Faye owned a
 
 *442
 
 beauty salon and beauty supply store. They had several life insurance policies worth a total of more than $300,000. In August 1990, in the presence of defendant, they revised three of the policies to name him sole beneficiary if they both died; a fourth policy named him and his mentally retarded brother Lavelle co-beneficiaries.
 

 Defendant had a strained relationship with his father; they often argued and his father periodically evicted him from the house for weeks or months at a time. He told friends that he would “take his father out” or “take care of him.” He also told friends about his parents’ insurance policies, indicating that he would inherit a large sum if they died. On one occasion, while discussing ways of making money with two friends, he said that he knew how they could make $275,000, but that it would take a month and a half to get the money. He told them that if they would “bump off’ two people who lived around the comer and owned a beauty supply and hair salon, they would be paid a “five-digit” sum of money. On another occasion, while watching a television program about the Menendez brothers, who were charged with the notorious crime of murdering their parents for their inheritance, he commented to the effect that “They did it wrong. They shouldn’t have got caught.”
 

 In September, Arthur and Faye left for a two-week vacation, leaving their truck at the home of Faye’s parents, the McKays. Defendant stayed at home.
 

 Defendant’s parents kept a .38-caliber revolver with a brown handle at the beauty supply shop in case of robberies; they kept a handgun, a .22-caliber derringer, under their bed at home. About a week after his parents left, following a visit to the beauty salon, defendant showed his friend John Nichols the .38-caliber revolver, which he was carrying in his pants; shortly thereafter, he gave Nichols the .22-caliber derringer. On several occasions he mentioned to Nichols that he had hollow-point bullets.
 

 Two or three days before his parents were to return, late at night, he told friends who were staying at his house that he heard something in the backyard. Taking the .38-caliber revolver, he looked around the outside the house, but did not find anyone. He said that he had received threatening telephone calls from the East Side Dukes, a local Latino gang. The following day, he showed friends the letters “ESD” spray-painted on the backyard patio.
 

 During the week before his parents’ return, defendant repeatedly asked a cousin, who lived behind the McKays’ house, to call him when his parents left for home. On October 11, Arthur and Faye returned from vacation to the
 
 *443
 
 McKays’. They spent the night and most of the following day at a family gathering at the McKays’. On October 12, defendant telephoned throughout the day and evening to find out when his parents were returning home, but declined invitations to come to dinner. In the afternoon, friends observed that he was drinking malt liquor and was fidgety. As was typical, he was wearing faded blue jeans. A brown gun handle protruded from his pocket. He said he was going to stay home and wait for his parents.
 

 Arthur and Faye left the McKays’ house for home at 11:20 or 11:25 p.m. A neighbor, Bertha Sanchez, saw their truck arrive at 11:40 p.m.. Between 11:50 and 11:55 p.m., she and her husband heard three gunshots. Another neighbor, Craig Hartman, also heard gunshots between 11:30 and 11:45 p.m.; he heard no other shots that night.
 

 On October 13, at 12:04 a.m., defendant’s aunt telephoned to find out if his parents had arrived home safely. Defendant answered, sounding nervous and rushed; he said that they had not returned and he was getting ready to go out. He did not offer to leave a note for his parents. At 12:31 a.m., defendant’s aunt called again. This time, defendant said that his parents were home but did not offer to put them on the line, as he usually did.
 

 Sometime after midnight, Sanchez heard what she thought was the Stat-ens’ truck starting and driving away; it returned around 20 minutes later.
 

 Around 1:05 a.m., defendant knocked on the Hartmans’ door and said that his parents had been killed; he was crying and appeared to be vomiting. When the Hartmans returned with defendant to his house, they found Faye’s body lying facedown near the entryway and Arthur’s body in the master bedroom. The words “BSD Kills” were spray-painted on a mirrored wall in the living room.
 

 Sheriff’s deputies arrived at the scene and attempted to speak to defendant, but he did not answer, appearing to be in a trance. Craig Hartman thought that he was “faking,” because he had been able to communicate earlier. Defendant had a cut with dried blood on his right middle finger, and he was wearing shorts. Later, at the sheriff’s station, while talking with his aunts, defendant collapsed and appeared unconscious. When paramedics arrived, however, he was alert and well-oriented, needing no medical care. Defendant’s aunts returned to the Staten house to retrieve a change of clothing; they looked for a pair of blue jeans, his usual attire, but found none.
 

 Arthur died of a single gunshot wound to the head with a .38- or .357-caliber hollow-point bullet. Faye died of multiple stab wounds; of 18
 
 *444
 
 wounds, seven could have been fatal. There was no evidence of forced entry or robbery, and there were no signs of entry in the backyard. In a den, a book of historic newspaper headlines was open to an article concerning the Sharon Tate murder case.
 

 There were bloodstains throughout the house; some could have been defendant’s, others could have been Faye’s. A handprint on the mirrored living room wall below the spray-painted graffito matched defendant’s. There was a 90 percent probability that the graffito on the mirrored wall was produced by the same writer as the graffito on the back porch. The paint on both was of the same formula; it also matched á can of spray paint found in the hall closet.
 

 At funeral services for his parents, defendant did not appear upset. He told a cousin that this was no time to cry because they were dead, buried and gone; instead, it was time to party and get high.
 

 On October 14, Nichols was stopped by law enforcement officers while carrying the .22-caliber derringer and was arrested for violation of probation. On November 3, he was released from custody and met with defendant while wearing a transmitting wire monitored by a detective. In the taped conversation, defendant said that he had “gotten rid of’ the .38-caliber revolver before his parents returned home. He suggested that Nichols lie about the gun to police and assured him that the police would not be able to find it and that as long as he stuck to his story, they would not have a case: “Because they lost. I’m still saying—but they can’t do shit. All they can do is close the mother fucker. HO If they still can’t find it, I’m still going to blame it on the Dukes.”
 

 The gang unit of the sheriff’s department concluded that the murders were not gang related and that the grafitti found in the house and backyard did not appear genuine or to have been written in the distinctive style of the East Side Dukes. Moreover, it would be unusual for graffiti to be hidden in a backyard or inside a house rather than the front of the house, as the gang’s purpose was to claim territory and to threaten others. The East Side Dukes typically performed their killings in drive-by shootings or after knocking on a victim’s door and calling him outside; they used graffiti to announce their killings to the whole neighborhood, usually including the gang member’s street name and identifying the intended victims. They did not ordinarily intentionally harm others living in their neighborhood, even if they were African-American, like defendant and his family. An investigator was told by members of the East Side Dukes that they would not have committed a crime of this kind.
 

 
 *445
 
 For his part, defendant introduced evidence, including his own testimony, as follows.
 

 Defendant had a good relationship with his parents, especially his mother. He never spoke to friends about killing his parents for the insurance money, although he did discuss other ways of making money, including tax-deferred retirement accounts and money management.
 

 The East Side Dukes repeatedly threatened him. During his parents’ vacation, he took their .38-caliber gun from the beauty shop, and gave Nichols the .22-caliber derringer, for protection. The .38-caliber gun disappeared one night after a party; defendant did not tell anyone because he suspected that one of Nichols’s friends had stolen it.
 

 The cut on defendant’s finger came from a hedge trimmer he used for gardening on the day of his parents’ return; he may have left a trail of blood in the house while looking for a bandage. He wore shorts all day; his blue jeans were either in his bedroom or in the laundry. That night, he was working on lyrics to a “rap” song and looked through the book of historic headlines in the den; he was not reading the headline about the Sharon Tate murders but was looking for headlines about Martin Luther King, Jr.
 

 Defendant’s parents arrived between 12:05 and 12:10 a.m. When his aunt called at 12:30, his mother indicated that she did not want to talk to her. He left in his parents’ truck to get a hamburger between 12:30 and 12:45 a.m. Realizing he did not have money with him, he returned home, arriving about 1:00. When he returned, he discovered his parents’ bodies and saw the spray-painted graffito in the living room that read, “ESD Kills.”
 

 Neighbors gave inconsistent reports to police officers about hearing gunshots that night; Sanchez told one police officer that she had heard “firecracker” noises after 12:30 a.m., not earlier. The Hartmans did not mention to that same officer that they had heard gunshots.
 

 No gunshot residue was found on defendant’s hands.
 

 B.
 
 Penalty Phase
 

 The People presented evidence in aggravation consisting of autopsy photographs of Faye’s wounds.
 

 In mitigation, defendant introduced the following evidence relating to his background and character.
 

 
 *446
 
 Defendant was intelligent; he graduated from high school and attended a community college for two years. He wrote rap songs for a music group that often had antigang, antidrug, or religious messages. He counseled other family members, friends, and neighborhood youth to avoid gangs and drugs. One friend testified that he never saw defendant take drugs.
 

 Defendant provided emotional support for his mentally disabled brother, Lavelle, and, apart from Arthur and Faye, was the person best able to communicate with him. It would be beneficial to Lavelle to be able to continue communicating with defendant.
 

 A psychiatrist who examined defendant in custody testified that the murders appeared to have arisen from family-specific emotional problems and that such crimes have a very low rate of recidivism. Defendant showed no signs of mental illness and generally knew how to behave appropriately and to get along with others; he could be a positive influence on others in prison.
 

 II. Pretrial Issues .
 

 Defendant raises a number of claims concerning pretrial motions and jury selection that he asserts require reversal of the judgment of guilt. As will appear, none is meritorious.
 

 A.
 
 Requests for Second Counsel and Funds
 

 In April 1991, defendant filed a confidential application for appointment of second counsel. It was supported by a declaration by appointed counsel John D. Tyre, stating that “there are both serious issues for the guilt and penalty phases of this trial” and “it is therefore necessary for the court to allot funds to cover the cost of a second attorney to handle different parts of both phases of this trial.” In June 1991, defendant filed a second confidential application for appointment of second counsel, supported by an identical declaration.
 

 At the hearing on the application, counsel argued that the case involved “strictly circumstantial evidence” and that “the burden of going through a guilt phase, the circumstantial evidence, the possible inferences, the possible investigation, the numerous people that were used at the preliminary hearing and all the investigation that would be necessary in a guilt phase” supported appointment of second counsel to help him prepare “in case a penalty phase is necessary.” The superior court denied the application without prejudice, stating that “it’s not a clear-cut guilt case from the standpoint of the fact that
 
 *447
 
 it’s a circumstantial evidence case, but it’s a fairly straightforward case with not tremendous legal issues, complex issues involved.” Trial counsel did not renew the motion, although at one point during the trial, he was hospitalized for illness and the trial was continued for six days.
 

 Defendant argues that the superior court erred in denying the application for second counsel. He contends that with the aid of a second attorney, he would have been able to present more effective guilt and penalty phase presentations. The claim is without merit.
 

 In
 
 Keenan
 
 v.
 
 Superior Court
 
 (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108], we held that a trial court may appoint a second attorney in a capital case. “If it appears that a second attorney may lend important assistance in preparing for trial or presenting the case, the court should rule favorably on [a] request. Indeed, in general, under a showing of genuine need ... a presumption arises that a second attorney is required.”
 
 (Id.
 
 at p. 434.) “The initial burden, however, is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges.”
 
 (People
 
 v.
 
 Lucky
 
 (1988) 45 Cal.3d 259, 279 [247 Cal.Rptr. 1, 753 P.2d 1052].) An “abstract assertion” regarding the burden on defense counsel “cannot be used as a substitute for a showing of genuine need.”
 
 (Id.
 
 at p. 280;
 
 People v. Jackson
 
 (1980) 28 Cal.3d 264, 287 [168 Cal.Rptr. 603, 618 P.2d 149] [no abuse of discretion in denying application for second counsel when counsel merely relied on the circumstances surrounding the case].)
 

 No abuse of discretion appears. Defendant’s application, consisting of little more than a bare assertion that second counsel was necessary, did not give rise to a presumption that a second attorney was required; he presented no specific, compelling reasons for such appointment. Nor does the fact that counsel became ill during the guilt phase of trial demonstrate error in denying the requests months earlier; the illness was not anticipated. Indeed, counsel, whose earlier application was denied without prejudice, did not renew the request for second counsel; his illness was accommodated by a brief continuance of the trial.
 

 Defendant also submitted numerous requests for funds for investigation, forensic experts, law clerks, and travel and witness expenses pursuant to Penal Code section 987.9. He contends that if the requests had been granted, he would have been able to present a more effective case at the guilt and penalty phases. This claim, too, is without merit.
 

 The record indicates that some requests for funds for travel expenses, investigators, experts, and other assistance were denied for lack of a showing
 
 *448
 
 of necessity, untimeliness, or other defects; other requests, including requests for funds for travel expenses, investigators, experts, and other assistance, were granted in full or in part. Defendant fails to show that any of the denials or reductions was unreasonable under the circumstances. It is sheer speculation that greater funding would have resulted in a different outcome.
 
 [1]
 

 B.
 
 Change of Venue Motion
 

 Several weeks after his arraignment, defendant moved for a change in venue out of Los Angeles County, on the ground that “there is a reasonable likelihood that a fair and impartial trial of this matter cannot be had” therein. In a supporting declaration, he listed the following grounds: the brutality of the crime; the fact that defendant’s aunt, a municipal court judge in Los Angeles, was a potential witness; the small size of the community in which the offenses were committed; the fact that the victims were prominent members of the community; and the extensive media coverage and hostile reaction of the community to the offenses. The People countered that the gravity of the offense alone did not compel a change in venue; news coverage was limited and not sensationalized; apart from the homicide, the victims would have been virtually unknown; and the population from which the jury pool would be drawn, the Pomona Judicial District, was over 638,000.
 

 The superior court denied the motion, stating: “[T]he court believes that, while there was obviously some mention of the case and stories in the press regarding the case at the time it occurred, ... it was certainly not overly dramatized nor has the moving party indicated . . . that there has been a continuing notoriety attributed to the case.”
 

 The trial commenced several months later. The prospective jurors were examined by written questionnaires, prepared jointly by the prosecutor and defense counsel, about their exposure to news coverage of the case. Specifically, they were asked whether they had heard or read anything about the case. Those answering in the affirmative were asked to state what they had heard or read, to identify all sources of that information, and to state whether it would cause them to lean in the direction of the defense or the prosecution. They were also asked whether there was anything they would like to bring to the court’s attention that might affect their ability to be fair and impartial jurors, and to state any biases that could affect their judgment.
 

 
 *449
 
 Thirteen prospective jurors responded affirmatively in written responses to the questions concerning their knowledge of the case; of those, only one was selected to serve as a juror. That juror stated in her written responses that she had read in the newspaper that “it was a violent crime the likes of the Sharon Tate killing” and that defendant had said that gang members murdered his parents. She stated that the information did not cause her to lean in the direction of the defense or prosecution because it was “non-conclusive[;] no one saw him do it.” She indicated that she would be unbiased. Neither counsel nor the superior court orally questioned prospective jurors on the subject. Defendant exercised only 16 of his 20 available peremptory challenges (Code Civ. Proc., § 231, subd. (a)) before accepting the 12-juror panel as constituted.
 

 Defendant asserts that the superior court erred in denying the change of venue motion and in probing prospective jurors inadequately concerning the effects of pretrial publicity. The claim is without merit.
 

 “In determining whether a change of venue is warranted, the trial court typically considers the nature and gravity of the offense, the size of the community, the status of the defendant, the prominence of the victim, and the nature and extent of the publicity. On appeal, the defendant must show that the court ‘erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it was reasonably likely that a fair trial was not in fact had.’ ”
 
 {People v. Webb
 
 (1993) 6 Cal.4th 494, 514 [24 Cal.Rptr.2d 779, 862 P.2d 779].)
 

 Although the charged offenses herein were very serious, the superior court not unreasonably concluded that the remaining factors did not weigh in favor of a change of venue. The fact that defendant’s aunt was a municipal court judge did not make her well-known; indeed, none of the prospective jurors indicated that he or she knew of her. The relevant juror pool, the Pomona Judicial District, was large, exceeding that of the entire population of many California counties. “The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness.”
 
 {People v. Balderas
 
 (1985) 41 Cal.3d 144, 178 [222 Cal.Rptr. 184, 711 P.2d 480].) The victims, owners of a small local business, were not especially well-known in the community. “[N]othing in their status was calculated to engender unusual emotion in the community.”
 
 (Id.
 
 at p. 179.) Media coverage does not appear to have been extensive, sensational, or persistent at the time of the change of venue motion, consisting of a few articles in local newspapers. (See
 
 People
 
 v.
 
 Coleman
 
 (1989) 48 Cal.3d 112, 133-134 [255 Cal.Rptr. 813, 768 P.2d 32]
 
 *450
 
 [denial of motion for change of venue was not prejudicial error when, inter alia, publicity, “though initially graphic, was not ‘persistent and pervasive’ ”].)
 

 Of a panel of 107 prospective jurors, only 13 indicated that they had heard of the case; of those, only one juror was selected. (See
 
 People
 
 v.
 
 Balderas, supra,
 
 41 Cal.3d at p. 180 [sustaining denial of venue change when 27 of 59 prospective jurors had heard about the case, including five or six of the 12 jurors selected].) The only juror with knowledge of the charged crimes stated that she believed the information she had received was “non-conclusive” and that she would be unbiased in the case. We have no reason to doubt the veracity of her statements. (See
 
 People
 
 v.
 
 Webb, supra,
 
 6 Cal.4th at p. 515.)
 

 With regard to the adequacy of the screening of prospective jurors, the questionnaire, prepared jointly by the prosecution and defense counsel, sufficiently covered the question of pretrial publicity; defense counsel did not seek additional questions or exhaust his peremptory challenges. The superior court did not err in not further questioning prospective jurors on the point.
 

 Defendant argues, for the first time on appeal, that a change of venue was required in light of the publicity surrounding the trial of the Menendez brothers, who were also tried for killing their parents, and of the fact that he was an African-American in a “mostly Caucasian population.” The arguments are without merit. The Menendez trial was nationally publicized; similarity to that crime would be equally apparent to jurors elsewhere. Nor does defendant point to any evidence of unusual hostility to African-Americans or to pretrial publicity calculated to excite racial prejudice.
 

 Defendant also complains of ineffective assistance of counsel based on defense counsel’s failure to conduct a public opinion survey or to submit oral questions to the superior court during voir dire. This claim, too, is without merit.
 

 “Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. [Citations.] The ultimate purpose of this right is to protect the defendant’s fundamental right to a trial that is both fair in its conduct and reliable in its result. [Citations.] ft[] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to
 
 effective
 
 assistance.”
 
 (People
 
 v.
 
 Ledesma
 
 (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) To prevail on a claim of deprivation of effective assistance of counsel, a defendant must show that
 
 *451
 
 trial counsel’s performance was deficient under a standard of reasonableness.
 
 (Id.
 
 at pp. 216-217.) He must also show that prejudice resulted. Although in certain contexts prejudice is presumed, generally, a “defendant must show that there is a ‘reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ ”
 
 (Id.
 
 at pp. 217-218.) Defendant shows neither. Nothing in the record suggests that a public opinion survey was necessary or that the voir dire of prospective jurors was inadequate. Media coverage of the killings was apparently neither widespread nor persistent. The juror questionnaire included questions covering any exposure of prospective jurors to pretrial publicity. Nor does prejudice appear. Only a single juror was even aware of the case and she indicated that the information she received was
 
 [2]
 

 C.
 
 Voir Dire About Possible Racial Bias
 

 Of the panel of 107 prospective jurors, 76 were Caucasian, seven were African-Americans, and the rest were Latino or Asian-American. The written questionnaires contained a question asking jurors to describe defendant and general questions about possible bias, including racial bias. None of the potential jurors indicated that racial bias would affect his or her decision. A jury of 11 Caucasians and one African-American was ultimately selected to try the case.
 
 [3]
 

 Defendant contends that the superior court erred in failing to ask the predominantly Caucasian jury panel additional questions “designed to bring out their hidden prejudices against blacks like [him] accused of heinous crimes.” He also asserts that such failure violated his state and federal constitutional right to a fair trial.
 

 “[A] defendant cannot complain of a judge’s failure to question the venire on racial prejudice unless the defendant has specifically requested
 
 *452
 
 such an inquiry.”
 
 (Turner
 
 v.
 
 Murray
 
 (1986) 476 U.S. 28, 37 [106 S.Ct. 1683, 1689, 90 L.Ed.2d 27]; see also
 
 People v. Horton
 
 (1995) 11 Cal.4th 1068, 1093 [47 Cal.Rptr.2d 516, 906 P.2d 478] [in light of defense counsel’s failure to ask further questions of prospective jurors after being provided an opportunity to do so, defendant waived the right to complain of the trial court’s restriction of voir dire].) Defendant participated in drafting the questionnaire, presumably including the questions regarding bias. He did not request additional voir dire concerning racial bias; nor does he justify his failure to do so. The point is waived and will not be considered on its merits.
 

 In the alternative, defendant argues that trial counsel’s failure to ask additional questions of the jurors amounted to ineffective assistance of counsel. He asserts that because the jury had to decide whether the killings were committed by him or a Latino gang, the biases of jurors might improperly influence their determination of guilt or innocence. The claim is lacking in merit. The questionnaire, which trial counsel helped prepare, included several questions designed to elicit the racial bias of prospective jurors. Defendant fails to show that additional or different questions would have been more effective in uncovering juror biases.
 

 D.
 
 Witherspoon-Witt Error
 

 Defendant asserts that three jurors, Dorothy C., Charles N., and Barbara H., all of whom ultimately voted to impose the death penalty herein, evinced bias in favor of the death penalty and should have been excused for cause by the superior court.
 

 Dorothy C. indicated in response to the written questionnaire that she would “vote for the death penalty if the- evidence called for it” and that she “would only vote for the death penalty if I honestly believed it would be right for this case.” She also stated that she believed that the death penalty “should be given” in cases of “multiple murders, like serial killers,” because it would stop additional killings, and also in cases involving young children. She expressed a belief that life in prison without the possibility of parole is a more severe sentence than the death penalty. In response to other questions, she also stated that she would follow the judge’s instructions, “listen to both sides,” and, in judging the conduct of another, would “listen carefully and do the best I could. I believe I could be fair.” She also marked “yes” in response to the question whether she would vote for the death penalty “in every case,
 
 regardless
 
 of the evidence” if the defendant was convicted of first degree murder with at least one special circumstance.
 

 During voir dire, Dorothy C. stated that she would follow the judge’s instructions even if they differed from her beliefs, and that she would vote
 
 *453
 
 for the death penalty or life imprisonment without possibility of parole as she found appropriate. Asked by the superior court to explain the affirmative response to the question whether she would vote for the death penalty in every case, regardless of the evidence, she responded that she “took it to mean that if . . . the evidence had proved the circumstances then I would vote the death penalty.” She “definitely” agreed that she would consider both penalties and vote for the one she felt appropriate under the facts and law.
 

 Charles N. responded in the questionnaire that “[t]he ones committing hideous crimes
 
 must
 
 be executed!” and “I
 
 hate
 
 it when they get off with a technicality!” He explained: “If I thought he (she) deserved death for the murder, I would vote for death, otherwise I would vote for life without parole.” He would not vote for the death penalty in every case regardless of the evidence. He would base his decision “entirely on the circumstances, weigh
 
 all
 
 the evidence and make a decision based upon this evidence.” He believed that the purpose of the death penalty was to stop criminals who have committed “heinous” crimes from killing again. He also stated that he would follow the judge’s instructions even if they differed from his own beliefs. In voir dire, he affirmed that he would follow the judge’s instructions whether he agreed with them or not and would vote in favor of death or life imprisonment without possibility of parole as he believed appropriate.
 

 Barbara H.’s husband, two sons, and daughter-in-law were involved in law enforcement. She believed that “anyone who harms another—intentionally—should be punished” and that the courts are “generally, too lenient.” With regard to the death penalty, she stated that “it is sometimes justified,” but indicated that she would not, in every case, regardless of the evidence, vote for the death penalty and “strongly disagreed” that anyone who intentionally kills another person should always get the death penalty. She felt it was appropriate for serial killers, those who kill very young or elderly victims, and those who premeditate. She “strongly disagree[dj” that it was important to know about the defendant as a person and about his background before deciding between the penalties of death and life imprisonment without possibility of parole. In voir dire, she affirmed that she would follow the law as instructed, whether she agreed with it or not, and that, if defendant was found guilty, she would vote either for death or for life imprisonment without possibility of parole depending on what she believed was the appropriate penalty in this case.
 

 Defendant did not challenge any of the three jurors for cause or peremptorily and accepted the jury panel as constituted. Nor did he exhaust all of his peremptory challenges.
 

 Defendant contends that all three jurors were “death penalty zealots” who should have been excused for cause by the superior court based on their bias with regard to the death penalty.
 

 
 *454
 
 The proper standard for exclusion of a juror based on bias with regard to the death penalty—the so-called
 
 Witherspoon-Witt
 
 standard—is whether the juror’s views would “ ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ”
 
 (Wainwright v. Witt
 
 (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 846, 83 L.Ed.2d 841]; see also
 
 Witherspoon v. Illinois
 
 (1968) 391 U.S. 510, 522-523, fn. 21 [88 S.Ct. 1770, 1777, 20 L.Ed.2d 776].)
 

 Defendant did not challenge these jurors for cause or exhaust his peremptory challenges; because he did not raise it below, the point involving allegedly improper failure to excuse these jurors is waived.
 
 (People
 
 v.
 
 Lucas
 
 (1995) 12 Cal.4th 415, 480-481 [48 Cal.Rptr.2d 525, 907 P.2d 373].) It is also meritless. The superior court’s failure to excuse the jurors for cause, sua sponte, did not constitute error. None of the jurors expressed beliefs regarding the death penalty in the questionnaires and during voir dire that would necessarily subject them to excusal for cause; none expressed views that “ ‘would “prevent or substantially impair” the performance of the juror’s duties as defined by the court’s instructions and the juror’s oath.’ ”
 
 (Id.
 
 at pp. 481-482.) Although Juror Dorothy C. indicated on the questionnaire that she would vote for the death penalty “regardless of the evidence,” she explained in voir dire that she had understood the question to be whether she would vote for the death penalty if “the evidence had proved the circumstances”; she affirmed that she would consider both penalties under the facts and law in determining her vote.
 

 Defendant further asserts a claim of ineffective assistance of counsel, based on trial counsel’s failure to challenge the jurors for cause or exclude them peremptorily. The claim falls; defendant has not shown that counsel was ineffective in failing to challenge the jurors for cause, because there was no valid basis for such a challenge. Moreover, he has not shown that there could be no reasonable tactical basis for counsel’s decision not to use his peremptory challenges to excuse these jurors. Nor, in light of his failure to exhaust his peremptory challenges, was defendant prejudiced by the failure to excuse the jurors for cause.
 
 (People
 
 v.
 
 Lucas, supra,
 
 12 Cal.4th at p. 481.)
 

 III. Guilt Issues
 

 Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.
 

 A.
 
 Exclusion of Evidence Regarding Third Party Culpability
 

 During pretrial discovery, defendant obtained a copy of Detective Joseph Seeger’s notes of a conversation with “Randy,” a recovered “crackhead,” to
 
 *455
 
 the effect that “Andre”—apparently defendant—had cheated the “ESD’s” by selling them baking soda instead of crack cocaine. “Andre” was “ ‘spray basing’ ”—using crack cocaine with PCP. The note stated: “Hasn’t heard of threats by ESD’s but thinks they did
 
 it—Puppet &
 
 Casper.” Defendant sought discovery of all Los Angeles County Sheriff’s Department records regarding cases or contacts with Puppet and Casper. The superior court ordered the discovery of their names, addresses, and telephone numbers.
 

 Defendant subsequently sought sanctions or dismissal for failure to preserve the information concerning whereabouts of Randy or to do any follow-up investigation about Puppet or Casper. He also moved in limine to exclude all evidence or references to his own dealing in or use of narcotics or to his membership in a gang. The People moved in limine to exclude “rumor or hearsay evidence” that the East Side Dukes were responsible for the killing.
 

 At the hearing on the sanctions motion, Detective Seeger testified that he was approached outside the Staten residence on October 13, 1990, by “this young white male, somewhat disheveled and acting a little strange.” He appeared to be under the influence of narcotics or alcohol. He identified himself as “Randy” and said that he knew defendant and some of his friends. He said that he had not heard of any “pedo
 
 [sic],
 
 bullshit” between defendant and the East Side Dukes. He knew that defendant and his friends were selling cocaine to gang members and occasionally defendant had “stiffed them with some baking soda and/or some bunk dope,” but although a few “might be mad at him . . . there was nothing that was overt.” Randy did not think the gang had anything to do with the killings but “if they did, then he named two guys by the name of Puppet and Casper,” although he did not know them and could not even describe them. When asked for information about his address and how to contact him, “[Randy] got rambling and uncooperative” and walked off.
 

 Detective Seeger did not see Randy again. He subsequently investigated whether the East Side Dukes might have been involved, including contacting gang experts for advice, but found nothing indicating that the gang was responsible for the killings.
 

 With regard to the sanctions motion, the superior court determined that there was no improper failure to preserve or collect evidence. It deemed the evidence of Randy’s statements inadmissible, on the ground that it would “do nothing more than confuse issues and cause the jury to speculate on evidence that has little or no value.”
 

 The superior court granted defendant’s in limine motion to exclude all evidence or references to his drug dealing. With regard to the People’s
 
 *456
 
 motion to exclude evidence concerning the East Side Dukes, defense counsel agreed that he would not refer to Randy or “rumors on the street” without first making an offer of proof outside the presence of the jury that the East Side Dukes were actually involved. He did not subsequently make such an offer of proof at trial.
 

 Defendant contends that the evidence of Randy’s statements suggesting that members of the East Side Dukes might have killed the defendant’s parents should have been admitted. We reject the claim of error. As a threshold matter, it is doubtful that the point has been preserved on appeal, in light of defendant’s successful motion to exclude all evidence or reference to his own drug dealing and his failure to make an offer of proof concerning Randy’s statement. In any event, it is without merit. Randy’s statement was inadmissible hearsay, irrelevant, and unduly prejudicial. It provided no actual information concerning the case; nor did it evince any personal knowledge whether the East Side Dukes killed the Statens. Randy merely speculated that two purported gang members he had never met
 
 might
 
 have committed the killings in retaliation for defendant’s having “burned” them in a drug sale.
 

 Defendant also urges that defense counsel provided ineffective assistance of counsel in failing to renew his attempt to introduce Randy’s statement. The claim fails in the absence of a showing that trial counsel’s representation fell below a standard of reasonableness. He had obvious tactical reasons not to do so: the evidence was damaging to defendant’s own credibility, to the extent that it identified him as a drug user and
 
 [4]
 

 B.
 
 Instructions on Reasonable Doubt and Circumstantial Evidence
 

 The superior court gave the pattern instructions to the jury on reasonable doubt and circumstantial evidence. (After CALJIC Nos. 2.00, 2.01, 2.02, 2.90 (5th ed. 1988).) Defendant did not object to the instructions.
 

 Defendant contends that the reasonable doubt instruction is erroneous in referring to “moral certainty” and “moral evidence.”
 
 [5]
 
 He argues that the due process clauses of the federal and state Constitutions include the right to be convicted only on proof beyond a reasonable doubt based on the evidence, rather than moral certainty.
 

 
 *457
 
 With regard to the circumstantial evidence instructions, defendant argues that they improperly allowed the jury to infer facts “merely by determining that the inferred facts ‘logically and reasonably’ flow from the proven facts, without making the constitutionally required
 
 additional
 
 judgment that the inferred fact was
 
 more likely than not
 
 to follow from the proved
 
 [6]
 

 We have repeatedly upheld the validity of the same instructions against identical claims; we decline to revisit the points. (See
 
 People v. Bradford
 
 (1997) 14 Cal.4th 1005, 1053-1054 [60 Cal.Rptr.2d 225, 929 P.2d 544];
 
 People
 
 v.
 
 Freeman
 
 (1994) 8 Cal.4th 450, 504 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)
 

 C.
 
 Instruction on Aiding and Abetting
 

 Defendant objected to any jury instruction on aiding and abetting. The superior court overruled the objection on the ground that “the People’s theory is that the defendant was involved; that they have no direct evidence that he was the perpetrator, even though that’s also their theory, that (A) he was the perpetrator; (B), if he wasn’t, he’s an aider and abettor.” The prosecutor confirmed that the People were presenting both theories.
 

 The superior court gave the pattern instructions with regard to aiding and abetting, which state, inter alia, that “persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof’ include “[t]hose who aid and abet the commission of the crime.” (CALIIC No. 3.00 (5th ed. 1988).) It instructed that “a person who aids and abets the commission of a crime need not be
 
 *458
 
 personally present at the scene of the crime,” that “[m]ere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting,” and that “[m]ere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.” (CALJIC No. 3.01 (5th ed. 1988).) The superior court also instructed: “If the evidence establishes beyond a reasonable doubt that the defendant aided and abetted the commission of the crime charged in this case, the fact, if it is a fact, that he was not present at the time and place of the commission of the alleged crime for which he is being tried is immaterial and does not, in and of itself, entitle the defendant to an acquittal.” (CALJIC No. 4.51 (5th ed. 1988).)
 

 In closing argument, the prosecution alluded to the possibility that defendant may have had an accomplice who assisted him in committing the killings: “Now, whether he had to do it on his own or not, we may never know. Whether there was somebody else hiding in the house when his parents got there and assisted him, we will not know. Only he knows that. HO But he was clearly there. He clearly helped set it up. And I would argue to you that he was involved, if not doing the entire thing by himself.”
 

 Defendant contends that the superior court erred in instructing the jury on aiding and abetting. He asserts that the prosecution’s case was based entirely on the theory that he was the lone perpetrator; no evidence was presented from which the jurors could reasonably infer that he had arranged with an accomplice to murder his parents. Accordingly, the instruction might have confused the jury or permitted it to avoid making findings on relevant issues.
 

 The claim fails. In pretrial proceedings, the People argued: “It is not necessary to prove that the defendant was the actual killer of either parent so long as he was either a co-conspirator or aider and abettor to the crimes. [Citation.] Based upon the facts presented the only logical conclusion is that Staten either did the crimes himself or with assistance thereby making him guilty of two counts of first degree murder.” They also argued that theory at trial. There was sufficient basis for the jury to find from the evidence that defendant could have been guilty as an aider and abettor: he had discussed the idea of killing his parents with friends, and the lack of forcible entry on the night of the murders suggested that he either committed the killings himself or left the house unlocked for the actual killers. His defense that he was not at home at the time of the killings and that one person could not have committed both murders was not inconsistent with a theory of aiding and abetting. If the jury had accepted his evidence on that point, it could
 
 *459
 
 nonetheless reasonably have concluded that he accomplished the murders with the aid of others.
 
 [7]
 

 D.
 
 Failure to Instruct Sua Sponte on Absence of Flight
 

 Defendant asserts that the superior court erred in failing, sua sponte, to instruct that the jury might consider his absence of flight as a factor tending to show innocence. Pointing to Penal Code section 1127c, which requires an instruction on flight, when supported by the record, as showing consciousness of guilt, he argues that he has a “reciprocal” right to an instruction on
 
 absence
 
 of flight, as showing lack of guilt.
 

 We discern no error. In
 
 People
 
 v.
 
 Green
 
 (1980) 27 Cal.3d 1, 39-40 and footnote 26 [164 Cal.Rptr. 1, 609 P.2d 468], we held that refusal of an instruction on absence of flight was proper and was not unfair in light of Penal Code section 1127c. We observed that such an instruction would invite speculation; there are plausible reasons why a guilty person might refrain from flight.
 
 {Green, supra,
 
 27 Cal.3d at pp. 37, 39.) Our conclusion therein also forecloses any federal or state constitutional challenge based on due process. (See also
 
 People
 
 v.
 
 Williams
 
 (1997) 55 Cal.App.4th 648, 652-653 [64 Cal.Rptr.2d 203] [rejecting constitutional argument with regard to instruction on absence of flight].)
 

 In the alternative, defendant asserts that trial counsel’s failure to request an instruction on absence of flight constituted ineffective assistance of counsel. It was not objectively unreasonable not to request an instruction that has been held improper. Nor can defendant show that he was prejudiced thereby; it is merely speculative thát the jury would have reached a different verdict if it had been so instructed.
 

 E.
 
 Sufficiency of the Evidence
 

 Defendant contends that the evidence is legally insufficient to establish that he murdered his parents and therefore insufficient under the United States and California Constitutions to support the judgment of conviction. Specifically, he argues that the evidence of his guilt was inconclusive because he did not attempt to realize any financial gain after the killings
 
 *460
 
 and had a loving relationship with his parents. He also disputes that he had an opportunity to kill his parents and points to the lack of gunshot residue on his hands or blood on his clothing. He asserts that there was abundant evidence suggesting that gang members were responsible for the killings. His claim goes to identity: he asserts, in effect, that there was insufficient evidence that he was the perpetrator.
 

 In
 
 Jackson v. Virginia
 
 (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560], the United States Supreme Court held, with regard to the standard on review of the sufficiency of the evidence supporting a criminal conviction, that “[t]he critical inquiry . . . [is] . . . whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]his inquiry does not require a court to ‘ask itself whether
 
 it
 
 believes that the evidence at the trial established guilt beyond a reasonable doubt.’ [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” An identical standard applies under the California Constitution.
 
 (People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) “In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court ‘must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence.’ ”
 
 (Ibid.)
 

 Under the foregoing standard, defendant’s claim fails. Viewing the evidence as a whole, in the light most favorable to the prosecution, it is clear that a rational jury could reasonably have rejected the defense and deduced that defendant was the killer.
 

 There was substantial evidence that defendant planned and executed the murders for the purpose of obtaining insurance money, and attempted to avoid detection by suggesting that others were responsible. Thus, defendant, who had a hostile relationship with his father, repeatedly spoke of “taking him out”; he also told his friends that he would inherit a large amount of money if his parents died. During their absence on a vacation, he took their .38-caliber gun, for which he had hollow-point bullets. On the day of their return, he waited at home, armed with the gun, calling repeatedly to find out when they would arrive. Shortly after their return, gunshots were heard by neighbors. Between the time of the gunshots and the time that defendant reported the killings to neighbors, he drove away in his parents’ truck and returned to the house; the .38-caliber gun and the blue jeans he was seen
 
 *461
 
 wearing that day were never found, suggesting that he concealed or destroyed the evidence. His father was killed by a hollow-point bullet that could have been shot from a .38-caliber gun. His mother was killed by multiple knife wounds; defendant had a fresh cut on his hand and his blood was found throughout the house. After the murders, he did not appear to mourn their death, but spoke after the funeral of “party[ing] and getting] high.”
 

 Defendant also took steps to suggest that members of the East Side Dukes, not he, committed the murders. A few days before his parents’ return, he showed friends threatening graffito that he had “found” in his backyard; after the murders, similar graffito in matching spray paint was found in the living room above defendant’s handprint. Both graffiti were written using the same kind of spray paint that was found in a closet in defendant’s house. During the police investigation, he boasted to his friend that they had no case against him, and stated that he would continue to blame the murders on the gang.
 

 F.
 
 Sufficiency of Evidence Supporting Special Circumstances
 

 Defendant asserts that the evidence at trial was insufficient to support the jury’s findings of the special circumstances that he killed multiple victims (Pen. Code, § 190.2, subd. (a)(3)) and that he did so for financial gain {id., subd. (a)(1)).
 

 In reviewing the sufficiency of the evidence supporting a special circumstance finding, we must view the evidence in the light most favorable to the People.
 
 {People
 
 v.
 
 Alvarez
 
 (1996) 14 Cal.4th 155, 225 [58 Cal.Rptr.2d 385, 926 P.2d 365].) “The special circumstance focuses on the defendant’s intention
 
 at the time the murder was
 
 committed.”
 
 (People v. Howard
 
 (1988) 44 Cal.3d 375, 409 [243 Cal.Rptr. 842, 749 P.2d 279].)
 

 With regard to the multiple-victim special circumstance, defendant contends that even if there was sufficient evidence that he killed his father, the testimony concerning his loving relationship with his mother precludes a finding that he could have stabbed her repeatedly. He is unpersuasive. The jury was not required to believe that testimony, or to accept the inference that his feelings for her made it impossible for him to kill her or aid and abet her killing.
 

 With regard to the financial-gain special circumstance, defendant asserts that his failure to recover on the insurance policies precludes a finding that he was motivated by financial gain. Again, he is unpersuasive. “Proof
 
 *462
 
 of actual pecuniary benefit to the defendant from the victim’s death is neither necessary nor sufficient to establish the financial-gain special circumstance. . . .‘[T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.’ ”
 
 (People
 
 v.
 
 Edelbacher
 
 (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1].) His failure to recover insurance benefits after the killings does not undercut evidence of a financial motive at the time of the killings. The jury could reasonably have viewed such failure either as an abandonment of his plan or as an attempt to deflect attention from himself as the perpetrator after the murders.
 

 IV. Penalty Issues
 

 A.
 
 Constitutionality of California Death Penalty Law
 

 Defendant contends that the California death penalty is unconstitutional under the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Specifically, he claims that the death penalty is inherently cruel and unusual punishment; that it is inherently unconstitutional because it cannot be imposed fairly; that California’s laws defining first degree murder, the class of death-eligible defendants, and the aggravating circumstances that the jury may consider are unconstitutionally broad; and, finally, that the California capital sentencing process suffers from a wide variety of procedural and substantive defects that individually and collectively violate state and federal due process, cruel and unusual punishment provisions, and Eighth Amendment reliability requirements, fail to give the jury proper guidance, and result in a vague, arbitrary, and capricious selection of death as the appropriate sentence. As defendant acknowledges, we have previously rejected the identical contentions. (See
 
 People v. Bradford, supra,
 
 14 Cal.4th at pp. 1057-1059;
 
 People
 
 v.
 
 Carpenter
 
 (1997) 15 Cal.4th 312, 419-421 [63 Cal.Rptr.2d 1, 935 P.2d 708];
 
 People
 
 v.
 
 Rodrigues
 
 (1994) 8 Cal.4th 1060, 1194-1195 [36 Cal.Rptr.2d 235, 885 P.2d 1];
 
 People v. Crittenden
 
 (1994) 9 Cal.4th 83, 152-160 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We decline to revisit the points.
 

 B.
 
 Admission of Autopsy Photographs
 

 At the commencement of the penalty phase, the People sought to have admitted into evidence color photographs taken at the autopsy of Faye Staten, to show the circumstances of the crime. None of the photographs showed the face of the victim and, although they depicted her injuries, the wounds were “cleaned up, that is, there is no blood present.” Defendant objected on the ground that the prejudicial effect of the photographs outweighed their probative value (Evid. Code, § 352). The photographs were admitted.
 

 
 *463
 
 At the conclusion of the penalty phase, the superior court directed the jury to take the photographs into the jury room. The court explained: “I’m going to have the bailiff tell them to take in [the photographic exhibits] first and to tell them these are the exhibits that were introduced during the penalty phase. I’m going to have her come out, and then I’m going to have her take in the other exhibits to tell them that these are available to them, if they wish to use them, during their deliberations.”
 
 [8]
 

 Defendant contends that admission of the photographs was error. He argues that the evidence was more prejudicial than probative and was cumulative in light of the extensive testimony of the pathologist concerning Faye’s wounds.
 

 The evidence was admissible under Penal Code section 190.3, factor (a), to show the “circumstances of the crime of which the defendant was convicted in the present proceeding.”
 
 (Ibid.)
 
 As we recently explained in
 
 People v. Box
 
 (2000) 23 Cal.4th 1153, 1200-1201 [99 Cal.Rptr.2d 69, 5 P.3d 130], “the trial court lacks discretion to exclude
 
 all
 
 [evidence under Penal Code section 190.3, factor (a)] on the ground it is inflammatory or lacking in probative value.” Although the trial court’s discretion to exclude evidence showing the circumstances of the crime is more circumscribed than at the guilt phase, “[n]either [Penal Code section 190.3, factor (a) nor factor (b)] . . . deprives the trial court of its traditional discretion to exclude ‘particular items of evidence’ by which the prosecution seeks to demonstrate either the circumstances of the crime . . . , or violent criminal activity ... in a ‘manner’ that is misleading, cumulative, or unduly inflammatory.”
 
 (Id.
 
 at p. 1201.)
 

 We find no error; the superior court did not abuse its discretion in admitting the photographs. The photographs were not unusually gruesome; they were taken in a clinical setting and depicted cleaned-up wounds; none showed the victim’s face. They were neither cumulative nor misleading and were highly probative of the penalty issues, demonstrating the deliberate and brutal nature of the crime, which involved 18 stab wounds, many of which were individually fatal.
 

 
 *464
 
 C.
 
 Denial of Request for Instruction on Lingering Doubt
 

 Defendant requested a special jury instruction that lingering doubt could be considered as a mitigating factor. The superior court refused the instruction, on the basis that there was no authority for such instruction, but permitted defendant to present an argument in that regard to the jury.
 

 Defendant contends that the refusal to instruct on lingering doubt was error. We rejected the identical point in
 
 People v. Hines
 
 (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388], holding that the proposed instruction was unnecessary. We decline to revisit the issue.
 

 Defendant raises additional claims under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. They, too, are meritless. The federal constitutional provisions are not implicated. The United States Supreme Court has held that capital defendants have no federal constitutional right to such an instruction.
 
 (Franklin v. Lynaugh
 
 (1988) 487 U.S. 164, 173-174 [108 S.Ct. 2320, 2327, 101 L.Ed.2d 155].)
 

 D.
 
 Cumulative Error
 

 Defendant urges that cumulative error in the pretrial proceedings and in the guilt and penalty phases variously requires reversal of the guilt and penalty verdicts and the judgment of death. The premise for the claim is defective: we have rejected each of defendant’s claims of error. It necessarily follows that the claim of cumulative error is also defective.
 

 V. Posttrial Issues
 

 A.
 
 Jury Misconduct
 

 After the judgment of death, in a declaration attached to his request for a new trial, defense counsel stated, inter alia, that “[t]he jury indicated after the trial that since the defendant did not show any emotion during his testimony that they sentenced him to death
 
 San Gabriel Valley Tribune
 
 (12-7-91) [ízc].” He did not identify the jurors or purport to quote their actual statements; counsel’s apparent source, a newspaper article, was not attached to the declaration.
 

 Defendant argues that the jury improperly considered his lack of remorse during his testimony. In effect, he claims juror misconduct, urging that the jury’s consideration, as an aggravating factor, of his lack of emotion or remorse during his testimony violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.
 

 
 *465
 
 At the threshold, we do not know whether the jury actually considered defendant’s lack of emotion or remorse. We are referred only to trial counsel’s hearsay statement of what jurors purportedly “indicated” to unidentified persons, which was apparently reported in a newspaper. That is too thin a reed to support a claim of juror misconduct or violation of constitutional rights. In any event, the claim is lacking in merit. The jury could properly consider the defendant’s apparent lack of emotion or remorse at trial, including during his own testimony, in evaluating the evidence presented in mitigation, e.g., that he was intelligent, had a loving relationship with his parents, and was concerned about his mentally retarded brother. Jurors could also properly consider his demeanor in evaluating his credibility, and for other purposes.
 

 Defendant also points to the prosecution’s remarks in closing argument to the effect that he had not “taken responsibility” or “shown remorse for the crime.”
 
 [9]
 
 To the extent he may be understood to assert prosecutorial misconduct, we reject the claim. The claim was waived by his failure to object to the statement at trial.
 
 {People v. Crittenden, supra, 9
 
 Cal.4th at p. 146.) It is also lacking in merit. The prosecution did not specifically argue lack of remorse as a factor in aggravation of penalty, but referred to the lack of remorse in the context of refuting the suggestion that defendant’s intelligence should be regarded as a mitigating factor. We have repeatedly held that such prosecutorial comment on the absence of remorse as a mitigating factor is not improper. (See
 
 People
 
 v.
 
 Williams
 
 (1997) 16 Cal.4th 153, 254 [66 Cal.Rptr.2d 123, 940 P.2d 710].)
 
 [10]
 

 B.
 
 Denial of Motion for New Trial
 

 Defendant moved for a new trial on the grounds that the jury came to a decision that was “against the evidence” and that rejection of his request for
 
 *466
 
 special instructions concerning mitigating factors created a risk of “unguided emotional response.” The motion was supported by a declaration by trial counsel that “the defendant was convicted . . . [and] sentenced to death by an immotional [sic] jury who improperly considered the law and its application. The jury indicated after the trial that since the defendant did not show any emotion during his testimony that they sentenced him to death
 
 San Gabriel Valley Tribune
 
 (12-7-91) [sic]. This is improper and should be considered by you the court as an improper reason for the death penalty.” Defendant did not request an inquiry into possible jury misconduct either in his motion or at the hearing.
 

 Defendant contends that the superior court erred in denying the new trial motion. He is unpersuasive.
 

 “ ‘ “The determination of a motion for a new trial rests so completely within the court’s discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.” ’ ”
 
 (People
 
 v.
 
 Cox
 
 (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351].) We reject the claim of error. As discussed, there was sufficient evidence to support the guilt and penalty verdicts; the assertion that the jury’s reasoning process was “clouded by emotion” was sheer speculation. Nor would it have been improper for the jury, deliberating about the testimony in mitigation, to consider defendant’s demeanor and failure to express remorse during his testimony.
 

 Defendant also asserts that the superior court erred in failing, sua sponte, to order an evidentiary hearing to investigate possible jury misconduct. This claim, too, fails.
 

 The holding of an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct is within the discretion of the trial court.
 
 (People
 
 v.
 
 Hedgecock
 
 (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260].) “The hearing should not be used as a ‘fishing expedition’ to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.”
 
 (Ibid.)
 
 At such a hearing, jurors “may testify to ‘overt acts’—that is, such statements, conduct, conditions, or events as are ‘open to sight, hearing, and the other senses and thus subject to corroboration’—but may not testify ‘to the subjective reasoning processes of the individual juror ....’”
 
 (In re Stankewitz
 
 (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260].) Here, no evidence of any overt acts of misconduct was presented. The vague reference in trial counsel’s declaration to a newspaper article describing the juror’s subjective mental processes did not require further inquiry by the court.
 

 
 *467
 
 VI. Disposition
 

 For the reasons stated, we affirm the judgment.
 

 George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied January 24, 2001.
 

 [1]
 

 Defendant further claims that the summary denial of his application for second counsel and the reduction or denial of funding requests violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution. The points are lacking in merit. The superior court did not abuse its discretion; there is thus no predicate error on which to base the constitutional claims.
 

 [2]
 

 defendant also claims that the erroneous denial of his motion for change of venue and the ineffective assistance of counsel deprived him of due process under the United States and California Constitutions. There was no error or ineffective assistance; a fortiori, there was no deprivation of the federal or state constitutional right to due process.
 

 [3]
 

 Of the 107 prospective jurors, 76 were Caucasian, 11 were Latino, seven were African-American, five were Asian-American, one was American Samoan, and others did not indicate race or ethnicity. The jury originally sworn included two African-Americans; one was subsequently excused for hardship and was replaced by a Caucasian alternate juror. The People note that defendant used peremptory challenges against two Latino, one African-American, one Asian-American, and one American Samoan juror. The People used peremptory challenges against 13 Caucasian, three Latino, and one African-American prospective juror.
 

 [4]
 

 Defendant also contends that the state law error violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because no error appears, the constitutional claims fail.
 

 [5]
 

 In relevant part, the instructions defined “reasonable doubt” as follows: “It is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence, is open to some possible or imaginary doubt, It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in
 
 *457
 
 that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.”
 

 [6]
 

 In relevant part, the instructions concerning circumstantial evidence stated: “Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. . . [A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime; but, two, cannot be reconciled with any other rational conclusion. HQ Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant’s guilt must be proved beyond a reasonable doubt, [fl] In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests, must be proved beyond a reasonable doubt. ft[] Also, if the circumstantial evidence as to any particular count ... is susceptible of two reasonable interpretations, one of which points to the defendant’s guilt, the other to his innocence, you must adopt that interpretation which points to the defendant’s innocence and reject that interpretation which points to his guilt, If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.”
 

 [7]
 

 Defendant refers to the instruction “on aiding and abetting
 
 or conspiracy theory.”
 
 The People withdrew their request for an instruction on conspiracy and none was given. Although the title of the written instruction given to the jury was “Alibi—Aider and Abettor or Co-Conspirator,” the word “co-conspirator” was redacted from the text of the instruction and did not appear in the oral instruction. To the extent that defendant may be understood to assert error, he is unpersuasive. He fails to show that the failure of the superior court to strike the words “or co-conspirator” from the title of the instruction resulted in any prejudice. Defendant’s additional claim that the erroneous instruction regarding aiding and abetting violated his federal constitutional rights under the Fifth and Fourteenth Amendments is also without merit; there was no predicate error.
 

 [8]
 

 defendant asserts that the superior court, over his trial counsel’s objection, ordered that
 
 only
 
 the photographs be sent to the jury room. The record contradicts his assertion: the court did not so order and his counsel did not so object. The court stated its intention of sending in the photographs first, and then the remaining exhibits. Defense counsel requested that “the only pieces of evidence given to the jury at this time are [the photographic exhibits].” The court disagreed: “I don’t know whether [all the trial exhibits are] necessary . ... [ID My sole standard is whether or not the correct legal thing to do is to send them in because of their obligation to weigh and consider circumstances of the offenses involved.” It then announced its order that
 
 all
 
 the trial exhibits be sent into the jury room.
 

 [9]
 

 Referring to testimony that defendant was intelligent, the prosecution argued: “[D]oes that mitigate? I don’t know that it mitigates. Does it make it worse? It can’t be deemed an aggravating factor, but you can question whether it really is a mitigating factor because an intelligent person, somebody who can think and realize all of the consequences of their acts, may be worse than the person who really can’t take into consideration all of the consequences of their acts. ... He has not taken responsibility for the crime. He has not shown remorse for the crime.’’
 

 [10]
 

 Defendant also points to the superior court’s rejection of his request for a special instruction listing the factors to be considered in determining penalty and stating that “no other facts or circumstances may be considered in aggravation or as a reason to support a verdict of death.” To the extent he can be understood to assert error on this ground, he is unpersuasive. The requested instruction, consisting, for the most part, of a general charge concerning the aggravating and mitigating factors to be considered, was properly rejected as duplicative of other instructions. The instruction also included a statement to the effect that the People must prove all aggravating factors beyond a reasonable doubt. The court properly rejected that portion of the proffered instruction as an incorrect statement of the law.
 
 (People
 
 v.
 
 Rodriguez
 
 (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)