Filed 10/21/13  P. v. Martin CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055372 |
| v. | (Super.Ct.No. RIF135704) |
| ROBERT ALBERT MARTIN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.

Affirmed with directions.

Catherine White, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and James H.

Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Robert Albert Martin was convicted of second degree murder (Pen. Code[1] § 187, subd. (a)) and active participation in a criminal street gang (§ 186.22, subd. (a)).  The jury further found true the allegations that defendant committed the murder to benefit his gang, within the meaning of section 186.22, subdivision (b), and that he personally used a deadly and dangerous weapon, within the meaning of former section 12022, subdivision (b)(1), and section 1192.7, subdivision (c)(23).  He was sentenced to 15 years to life, plus a consecutive one year in state prison.  He appeals, contending (1) the trial court violated his due process rights by admitting certain evidence when the state did not establish the proper foundation for its admission; (2) the trial court erred in failing to instruct the jury on the element of motive as to the criminal street gang crime; and (3) the abstract of judgment fails to correctly reflect the actual presentence custody credits.

## I.  FACTS

### A.  Prosecution's Evidence

The issues raised in this appeal require only an abbreviated recitation of the pertinent facts.  To the extent a more detailed recitation is necessary, it will be provided within the discussion of the issue.

On March 25, 2007, defendant and his friends went to a restaurant in Corona.  Also present was the victim, Joel Wright, along with his family and friends.  One of defendant's friends recognized Wright and indicated that Wright had previously

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

"jumped" their "slow friend." Defendant, who was drinking with his friend, became "bothered" after hearing about Wright "jumping" his friend, and he began staring and "maddogging" Wright and staring at the people he was with. Wright stood up and said, "'What are you looking at'" and shouted "'Norco.'" Defendant walked over to Wright's table and "chaos" erupted.

Defendant swung what appeared to be three or four fist blows toward Wright's chest and abdominal region. One of the blows caused Wright to "just stop[]," as if "the wind got knocked out of him." While being removed from the restaurant, defendant removed his shirt, threw gang signs and shouted "'Now what. Now what.'" Defendant got in a car, yelling "'Crown Town'" and "'CVLS.'" One witness identified a shirtless man who, while running in the parking lot, tripped and fell. When the man fell, he dropped a silver object that sounded like metal when it hit the ground. The police found a knife blade with blood on it in the parking lot.

Once inside the fleeing car, defendant began hitting the dashboard, laughing and screaming that he "stabbed that guy." Defendant exclaimed, "'I got him, I killed him. I knocked him out.'" During the drive, defendant was "[s]creaming, laughing hysterically," repeating, "'I got him. Knocked him out. I killed him. I fucked him up.'" When defendant arrived at the home of one of his friends, he ran through the house, after which a bladeless knife handle was found on the floor.

Wright died from stab wounds to his chest.

Detective Daniel Dunnigan of the Corona Police Department processed the crime scene. He saw the knife blade in the parking lot and the blood-stained multi-tool

3

corkscrew (corkscrew). Forensic technician Ralph Morales collected the items. After photographing them as found, Morales separately collected, packaged, and transported them back to the Corona Police Department where he locked them in a secure storage locker located in the laboratory. Sergeant Henderson collected the knife handle from the home, put it into an evidence envelope, and gave it to Officer Robert Montanez.

On April 12, 2007, Daniel Verdugo, a forensic technician with the Corona Police Department, transported the knife blade, knife handle, corkscrew and a sample of Wright's blood from the Corona Police Department property and evidence room to the local office of the California Department of Justice (DOJ) laboratory for forensic testing and analysis. DOJ analyst David Wu determined that the knife blade, knife handle and corkscrew all tested positive for blood. Wu swabbed the items and sent the swabs up to the Richmond office of the DOJ for DNA analysis. DOJ senior criminalist, Jonathan Schell, testified that Wright's DNA was found on the corkscrew and knife blade, and defendant's DNA was found on the knife blade and knife handle. Verdugo testified that the knife handle matched the knife blade found in the parking lot of the restaurant.

Defendant admitted that his chest tattoo, "CT," stood for "Crown Town" and Corona. He said that "Crown Town" represents the neighborhood where he grew up in Corona and the people he associated with. He "earned" this tattoo by "put[ting] in some work around the neighborhood." Defendant said he "jumped into" the gang when he was 12, and he "need[ed] to be respected."

**B. The Defense**

Forensic pathologist Frank Sheridan opined the knife blade found in the parking lot could not have physically caused Wright's fatal wound because the blade was not long enough. Dr. Sheridan agreed, however, that Wright had been stabbed to death. Defense gang expert Randal Hecht opined that defendant was not a "CVL" gang member because CVL is a Hispanic gang and gangs are race segregated.

Regina Meyer, property administrator for the Corona Police Department, testified that in general, once evidence is submitted to her, the chain of custody begins. She stated that chain of custody begins when an item is logged into the police property computer. In the instant case, Morales did not enter the seized items of evidence into the computer until April 4, 2007. Meyer testified that if anyone wished to know where that evidence was between March 25 and April 4, 2007, he or she would have to ask Morales. Meyer testified that police department personnel who collect evidence should computer log that evidence into property records, "as soon as possible."

Defendant was charged with and convicted of murdering Wright by stabbing him with a two and three-quarter-inch pocketknife during a fight.

## II. FOUNDATION TO ADMIT EVIDENCE OF KNIFE BLADE, KNIFE HANDLE AND CORKSCREW

Defendant contends the trial court should have excluded the knife blade and corkscrew, along with the knife handle, and testimony connected with this evidence, because the chain of custody was inadequate given the alleged gaps, coupled with significant mistakes committed by Morales. He claims reversal is required because the

5

admission of the testimony was so prejudicial as to render his trial fundamentally unfair. The People argue the chain of custody was adequate, as demonstrated by Morales's testimony, and the trial court properly admitted the evidence. They maintain that "[n]o evidence exists in the record which suggests actual tampering."

## A. Standard of Review

"We review a trial court's exercise of discretion in admitting evidence over a chain of custody objection for abuse of discretion. [Citation.] A chain of custody is adequate when the party offering the evidence shows to the satisfaction of the trial court that, ""'taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration.'"" [Citation.] The reasonable certainty requirement is not met when some ""'vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence.'"" [Citation.] However, when there is only the barest speculation that the evidence was altered, ""'it is proper to admit the evidence and let what doubt remains go to its weight.'"" [Citation.]" (*People v. Hall* (2010) 187 Cal.App.4th 282, 294.)

## B. Relevant Trial Proceedings

As noted, Morales was in charge of collecting the knife blade and corkscrew. He put them in separate bags, left the bags unsealed, and then put them in a large plastic evidence bin together with all of the other collected evidence.

6

Meyer was in charge of the property room at the Corona Police Department. According to the evidence envelope, Morales collected the blade from the crime scene on March 26, 2007; however, it was not logged into evidence on the department's chain of custody computer database until April 4, 200, at 1:24 p.m. Instead of Morales, Lindsey Walker, an intern in the forensic laboratory, logged it. There were no records of what happened to the blade between March 26 and April 4.

On April 12, 2007, according to the computer database, Meyer received the blade back from "[o]ne of three of the ID techs" from the laboratory. Meyer did not know which technician gave her the blade, and the computer said nothing about it. Twenty seconds later, ID Technician Danny Verdugo signed out the blade from the computer to transport it to the DOJ. The evidence tape on the bag showed Verdugo had possession on September 11, 2009. A separate piece of evidence tape showed that either Morales or Montanez had possession of the blade at an unspecified time.

Cadet Jessica Huerta picked up the blade from the DOJ on July 23, 2007. Huerta signed a form at the DOJ office, but no entry was made for the item being returned to the Corona Police Department. On September 10, 2007, Lindsey Walker entered on the log that Ralph Morales picked up the blade. On September 24, 2007, "someone" from the laboratory returned the blade to the police department. There was no evidence as to the location of the blade from September 10 through September 24, 2007. Meyer did not know what Morales did with the evidence during the two weeks. According to Meyer, "it's none of my business what they do with the evidence."

The tape on the evidence envelope in which the blade was sealed indicated that Morales collected the evidence on March 26, 2007. Two separate seals showed the envelope had been opened and resealed by Morales, but there was no indication of the dates this happened, nor were there corresponding dates in the computer's chain of evidence database. There was also an indication that Verdugo picked up the evidence on September 11, 2009.

Meyer "helped write and develop" the guidelines on chain of custody procedures at the Corona Police Department. She opined that the procedures used in maintaining the integrity of the blade evidence did not comply with chain of custody standards. Blain Kern, defense expert and forensic scientist, testified that the Corona Police Department did not adhere to accepted chain of custody principles. According to Kern, Morales mislabeled the knife blade as the corkscrew and the corkscrew as the knife blade shortly after it was collected. Kern also stated that, "at the time that the evidence was processed, it was processed under a different label, a different item number, and so I believe the processing of that item occurred under that new item number," and thus, "there is a high possibility there is going to be some transfer for DNA or biological evidence from the packaging to the item."

Regarding the corkscrew, Morales collected it from the scene on March 26, 2007, but Lindsey Walker entered into the computer database that it was booked into evidence on April 4, 2007. There was no accounting of its whereabouts from March 26 to April 4. Regarding the knife handle, Officer Montanez logged it into the computer database at 3:22 a.m. on March 26, 2007, indicating that it had been placed in the station's evidence

8

locker. At 7:59 a.m., Maria Rivera took the handle from the evidence room and transported it to another warehouse in a nearby building. Montanez did not note on the envelope the date and time the evidence was collected and sealed. There was another seal indicating that it was handled by "a DOJ employee" on April 12, 2007, but no indication of whether this was the date of receipt or release.

In response, Morales testified that on March 26, he photographed the crime scene, and then collected the evidence as directed by the lead detective. The knife blade was lying flat on the ground. The side facing up had a knob where the handle had fastened, and the other side was flat. He did not photograph or look at the side lying flat on the ground. There was visible blood on the side facing up. He did not do any presumptive blood testing at the scene; he just thought "it looked like blood." Because the photograph of the knob side of the blade had no visible blood, Morales explained that the quality of the photograph was poor, and the blood could be seen "when you look at the knife blade out in person." Morales acknowledged that the blood must have been on the side of the blade lying on the ground, but "we don't have any evidence that that stain was there at the scene."

Morales collected the items of evidence in numerical order; thus, he collected the corkscrew (and noted it as RM-2) before collecting the knife blade (and noted it as RM-12). However, the photographic log showed the opposite, namely, that he collected the knife blade before he collected the corkscrew. The knife blade and corkscrew, like all the other evidence, were put in separate bags, but the bags were unsealed and then put in a large plastic evidence bin, together with all the other collected evidence. Morales took

9

the evidence bin to the forensic laboratory and placed it in an evidence locker in a secure area.  Only four people had keys to the secure area.

Morales testified there was no policy on when evidence should be logged in.  He also claimed he never heard that evidence should be booked into the property system "as soon as possible after the seizure."  He did not know that he was to maintain the chain of custody by following the department's written policy that "[e]vidence must be first processed through the property system and then signed out."  He claimed there was "no time frame that we have to turn it into evidence," and it can be turned in "whenever you get either time or you're done with your analysis."

On April 4, 2007, Walker logged the evidence into the chain of custody database.  Morales admitted there was no way of knowing who "physically handled that evidence, who has picked it up, who has processed it," in the nine days between the dates of collection of the evidence and logging it into the chain of custody database by Walker.  According to Morales, when logging in the evidence, Walker did not take the items out of the evidence locker but rather went from Morales's notes (which he subsequently destroyed).  The evidence remained locked up.  Morales testified that Walker never physically handled the evidence; rather, she created labels from the database and gave them to Morales, who put them on the evidence envelopes when he later processed them.  Further, Morales testified that he correctly labeled the evidence.

After initially securing the evidence in the locker, Morales did not physically handle it until April 10, 2007, when Detective Dunnigan requested that it be processed for blood and fingerprints.  According to Morales's report, when he finished processing

10

the items, he placed them in "final packaging." They remained in his possession until April 12, 2007. On April 12, either he or Walker turned the evidence over to Meyer. Verdugo transported the items to the DOJ that day.

Prior to closing argument, defense counsel moved to exclude the knife blade and corkscrew, along with the knife handle, and testimony connected with these items, because gaps existed in the chain of custody due to Morales's failure to log the evidence into the property system. According to counsel, due to the mishandling of the evidence itself, "the testing and corresponding results are not reliable representations of the evidence as collected at the scene and must be excluded." The prosecutor disagreed, noting that Morales had placed the evidence into a locker inside a secured laboratory room at the police station. She argued that no evidence had been presented suggesting that Morales tampered with the evidence. Thus, she maintained that any deficiencies in Morales's performance should go to "weight and not admissibility."

The trial court noted, "this whole thing is very troubling to me," and that "Mr. Morales either didn't know there was protocol and, therefore, did not follow protocol or just didn't follow the protocol . . . ." Nonetheless, the court stated: "I don't see that—or make any finding that it was a—that it was an issue where he actually tampered with the evidence. I think that he—he's just incompetent . . . ." . . . It does not appear to me that there was anyone actually interested in tampering with the evidence or showing that Mr. Martin was the defendant or perpetrator in this case." The court denied the motion to exclude the evidence, finding that "it is as likely as not that the evidence analyzed was the evidence originally seized."

11

## C. Analysis

According to the defense, the prosecution failed to prove beyond a reasonable doubt that defendant was the actual stabber. In addition to arguing that witnesses described the assailant as a Hispanic or African-American male, defense counsel points to Dr. Sheridan's testimony that there was "no way" the "approximately two and three-quarter inch" pocketknife blade found at the crime scene could have "reach[ed] that far or even close to it." Even if that were possible, the defense maintains that the chain of custody gaps and the possibility of cross-contamination prevented the People from laying a proper foundation for the admission of evidence related to the knife blade, knife handle and corkscrew. Defendant argues that "[b]ecause the subsequent DNA testing of this evidence was the critical link[] between [him] and the stabbing, reversal is required." We disagree.

Defendant asserts there were alleged gaps in the chain of custody due to significant mistakes committed by Morales. For example, defendant criticizes Morales's placing of unsealed evidence bags into a plastic bin; his failure to personally book them into the department's computer database on a timely basis; his possible mislabeling of evidence; and his failure to follow protocol when handling the evidence. Defendant argues these mistakes, coupled with the critical gaps in the chain of custody, demonstrate the tampering or alteration of the evidence in question.

In contrast, the People contend that defendant's "suggestion of tampering is also based on bare speculation," because Morales's testimony "established the whereabouts of the challenged evidence and therefore the chain of custody." We agree. Nothing more

12

than pure speculation supports the claims of gaps in the chain of custody and tampering of evidence. As such, it must be rejected. (See *People v. Diaz* (1992) 3 Cal.4th 495, 559 ["'when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight'"].)

The facts in this case are similar to those in *People v. Wallace* (2008) 44 Cal.4th 1032 (*Wallace*). In *Wallace*, the issue involved the chain of custody for a pair of socks that were taken from the defendant at the time of his arrest. (*Id*. at pp. 1060-1061.) Specifically, defense counsel "objected that the outer envelope containing the two individually labeled envelopes was dated 1993, whereas the individual envelopes were dated June 19, 1991." (*Ibid*.) The arresting officer testified that he had removed the socks from the defendant's hands, processed them in the department's property room, and put them in containers, not the envelopes being used at trial. (*Ibid*.) The officer stated that the socks were in the same condition as when he had seen them during the defendant's arrest. The only difference was a small section had been cut from each sock. (*Id*. at p. 1061.) The officer testified that he had not initialed or otherwise marked any of the envelopes, and he had been informed by the property room staff that the socks had been repackaged several times. (*Ibid*.) He acknowledged that the absence of markings on the envelopes to establish chain of custody violated the standard operating procedure for the police department's property room. (*Ibid*.) Overruling the defendant's objection, the trial court admitted the socks into evidence. On appeal, the defendant challenged the trial court's ruling, contending "there was no recorded chain of custody information from the time of [his] arrest to the placement of the socks in individual envelopes, or for the

13

period between June 19, 1991 (the date on the individual envelopes), and 1993 (the date on the outer envelope)." (*Wallace*, *supra*, 44 Cal.4th at p. 1061.) Rejecting the defendant's challenge, our state's highest court stated that "[a]lthough the record of the chain of custody in this case was far from perfect, we disagree with defendant that these shortcomings rendered the admission of the socks an abuse of the trial court's discretion. [Citation.]" (*Ibid.*) Specifically, the Supreme Court noted that the defendant did "not suggest that the socks were tampered with, he merely assert[ed] it was 'as likely as not' that the socks tested by the prosecution's criminalist were not the same ones confiscated from defendant at the time of his arrest." (*Id.* at p. 1062.)

Here, Morales's testimony accounted for the whereabouts of the evidence. While he may not have entered the items into the computer database, he retained custody of them. He collected them, processed them, and kept possession of them in a locker in a secure room until they were transferred to the property clerk. "'While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.'" (*People v. Catlin* (2001) 26 Cal.4th 81, 134.) As for his allegedly critical mistakes in handling the evidence (possible mislabeling, use of same fingerprint brush on multiple items, possible swabbing off of entire blood sample from items, failure to set time and date function on his digital camera, and failure to take certain photographs), as the People aptly note, such mistakes show that Morales was sloppy in the performance of his job. They do not show that he purposely tampered with the evidence. Rather, defendant speculates such tampering. However, "'when it is the barest speculation that

14

there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citation.]" (*People v. Williams* (1989) 48 Cal.3d 1112, 1134.)

### III.  CALCRIM NO. 370

The jury received CALCRIM No. 370, which, in relevant part, instructed that "The People are not required to prove that the defendant had a motive to commit []any of the crimes charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.  [¶]  Having a motive may be a factor tending to show that the defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty."  The jury also received CALCRIM No. 1400 on the crime of gang participation (§ 186.22, subd. (a)):  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant actively participated in a criminal street gang;  [¶]  2.  When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; AND  [¶] 3.  The defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang by:  [¶]  (a) directly and actively committing a felony offense. . . ."

On appeal, defendant challenges the trial court's instruction that the state did not need to prove motive.  He argues that because motive is "effectively" an element of the gang participation charge, instructing the jury with CALCRIM No 370 lowered the prosecution's burden of proof as to that charge.  As defendant acknowledges, however, the court in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*), rejected the same challenge to CALCRIM No. 370 that defendant raises here.  We agree with the *Fuentes* court's reasoning:  "An intent to further criminal gang activity is no more a 'motive' in

15

legal terms than is any other specific intent.  We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death.  Combined, the instructions here told the jury the prosecution must prove that [the defendant] intended to further gang activity but need not show what motivated his wish to do so.  This was not ambiguous and there is no reason to think the jury could not understand it."  (*Fuentes*, *supra*, at pp. 1139-1140.)  We therefore reject defendant's argument.[2]

## IV.  ABSTRACT OF JUDGMENT

Defendant contends the abstract of judgment requires correction.  He was arrested on March 26, 2007, and sentenced on December 29, 2011.  The probation officer's report calculated that defendant had served 1,699 days between March 26, 2007, and November 18, 2011.  However, at sentencing on December 29, 2011, the trial court erroneously calculated that, "as of today's date, local time would be 1,699 days."  In fact,

---

[2] Defendant's claim that the *Fuentes* opinion failed to address the Supreme Court decisions that used the terms "motive" and "intent" interchangeably in charges involving financial gain special circumstances (*People v. Carasi* (2008) 44 Cal.4th 1263, 1308-1309; *People v. Staten* (2000) 24 Cal.4th 434, 461-462; and *People v. Edelbacher* (1989) 47 Cal.3d 983, 1026) is misplaced.  As the People point out, none of these cases held that the two terms are interchangeable; more importantly, they addressed sufficiency of the evidence challenges, not instructional error.  Motive and intent are not the same.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)  Likewise, defendant's claim that the motive instruction was flawed (*People v. Riggs* (2008) 44 Cal.4th 248, 314, *People v. Crew* (2003) 31 Cal.4th 822, 852, *People v. Noguera* (1992) 4 Cal.4th 599, 637, and *People v. Edelbacher*, *supra*, at p. 1027) is equally unavailing.  We agree with the People and conclude that none of the cases cited by defendant stands for the proposition that it would be error to give the motive instruction where a defendant was charged with a crime that required a mental state like the one required for street terrorism, and that the limiting language in the motive instruction was the only basis for rejecting the instructional error.

16

on and including December 29, defendant had accrued 1,740 days of actual presentence custody credit.  The People concede the abstract of judgment should be corrected, and we agree with their concession of error.  We will therefore order the abstract of judgment to be amended accordingly.

## V.  DISPOSITION

The judgment is affirmed.  The trial court is directed to issue an amended abstract of judgment that reflects credit of 1,740 days of actual presentence custody credits, and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

KING

J.

CODRINGTON

J.