Filed 3/8/16  P. v. Gomez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WENDY GUADALUPE GOMEZ,<br><br>    Defendant and Appellant. | F070460<br><br>(Super. Ct. No. BF150876A)<br><br>**OPINION** |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

Wendy Guadalupe Gomez was convicted of second degree murder and child abuse in the death of her two-year-old cousin Karla Isidro, who had been left in her care.[1]

---

*Before Gomes, Acting P.J., Franson, J. and Peña, J.

Appellate counsel filed a brief asserting she could not identify any arguable issues in the case. (*People v. Wende* (1979) 25 Cal.3d 436.) After a thorough review of the record we agree and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### The Information

The information charged Gomez with second degree murder (Pen. Code, § 187, subd. (a)),[2] and willfully causing great bodily injury to a child in her custody (§ 273a, subd. (a)). The second count alleged as an enhancement that Gomez personally inflicted great bodily injury to a person under the age of five. (§ 12022.7, subd. (d).)

### Prosecution Evidence—Testimony

On September 20, 2013, about 4:00 p.m. Gomez was driving in the Bakersfield area when she noticed that Karla, who was riding in the back seat, appeared nonresponsive. Gomez stopped the car and determined Karla had died. Gomez drove around the area for approximately seven hours with the dead child in the back seat before she called the emergency operator.

Forensic pathologist Yulai Wang performed the autopsy on Karla. The external examination began by noting she had severe malnutrition, which may have been related to the injury she suffered. He also noted scrapes on the front part of Karla's shoulder. The most significant injury was severe trauma to the back of her head. The fracture of the skull resulted in displacement of a piece of bone, which felt like a hard bump on the back of the head. A contusion to the back of the head indicated Karla suffered a blunt

---

[1]In the record the victim's first name is spelled both Carla and Karla, and her last name is spelled Ysidro and Isidro. We will spell the victim's name Karla Isidro to conform with the information.

Gomez's relationship to Karla is also unclear. Gomez often referred to Karla's mother as her sister, however it appears Karla's mother was Gomez's aunt, making Karla a cousin of Gomez. The exact relationship between Gomez and the victim is not significant to resolution of the appeal.

[2]All statutory references are to the Penal Code unless otherwise indicated.

force trauma, meaning the head was struck by a hard object or the head impacted a hard object. There were also multiple bruises on the forehead area indicating blunt force trauma to the forehead. Finally, he noticed bruising on the forearms and the legs consistent with ligature binding.

The internal examination of the scalp showed a fairly large displaced fracture on the back of the skull that extended from the base of the skull to the top of the skull and over to the front of the skull. He described the fracture as a severe complex fracture, which meant the fracture broke into many pieces. The cause of the fracture was a severe trauma. The injuries were probably caused by more than one event and were not accidental. Dr. Wang opined it is unlikely Karla suffered these injuries as a result of a fall. He also noted a subdural hematoma that was both acute and chronic, and a brain injury. The injury to the brain was caused by the blunt force injury to the head. These findings indicate at least some of the injuries occurred more than three weeks ago, and some were more recent. These injuries would be consistent with symptoms such as trouble speaking, loss of balance, vomiting, seizures, and weight loss. The cause of death was blunt force trauma to the head resulting in a homicide.

The issue at trial was who caused the injuries to Karla and, to a lesser extent, how the injuries occurred. Gomez was caring for Karla and her sister A. because the children's mother went to Mexico. The mother was expected to return to California within a week or so. However, Gomez had been caring for the children for approximately two months at the time of Karla's death.

Maria Pantoja was the mother of Jaime Pantoja Calderon.[3] Jaime was a friend of Gomez. Beginning in August 2013, Maria spent some time with Gomez as a result of Jaime's friendship with her. Gomez lived with the Pantojas for a short period of time because work was being done on her apartment. Maria met the children when Gomez

---

[3]We will refer to the Pantojas by their first names to ease the reader's task. No disrespect is intended.

brought them to her house. Karla did not look healthy, and something appeared to be wrong with her head. Karla also appeared to have problems with her balance. Maria noticed in the morning of September 20, Karla could not hold up her head. Maria told Gomez to take Karla to the doctor, but Gomez said she could not until she received a letter from Karla's mother giving Gomez permission to do so. On cross-examination Maria testified she never saw Gomez abuse Karla.

Jaime testified he initially was just friends with Gomez, but for a time they had a romantic relationship. The first issue Jaime noticed regarding Karla was that she appeared sad. About a month later, Karla began vomiting after she ate. This vomiting continued intermittently until Karla died. In the beginning of August, Jaime noticed bumps on Karla's head. One of the bumps began to grow over time, and other bumps appeared. On September 19, Karla had a seizure and started grinding her teeth. Jaime and Gomez were both worried about Karla. Gomez stated she could not wait any longer for a letter from the children's mother and she would take Karla to the doctor on the 20th. Karla and Gomez lived in Jaime's house for the last 12 days of Karla's life.

Jaime never was concerned that Gomez was too rough with Karla, although he had told police officers Gomez became frustrated when Karla misbehaved and she was then hard on Karla. Jaime also saw Gomez tie Karla up on August 31. That was the only time that occurred, and Karla was tied up 20 to 30 minutes. He testified he never saw Gomez shake Karla.

Xochitl Garcia is Gomez's aunt. She spoke with Gomez many times while Gomez had the children. Gomez would tell Garcia the children were fine, but Karla did not eat well. On cross-examination Garcia testified she had not seen Gomez abuse Karla, nor did she see signs of abuse on the children.

*Prosecution Evidence—Recorded Statements*

The prosecution introduced three recordings. The first was the call made by Gomez to the emergency operator. The second was the initial interview of Gomez by

4.

police officers when they arrived at the scene after Gomez called the emergency operator. The third was the investigating detective's interview of Gomez the following day.

### Call to the Emergency Operator

In the call to the emergency operator, Gomez stated Karla was dead. Gomes stated Karla had been sick, but she did not know why she died. She admitted she had custody of the children for approximately two months when their mother left for Mexico. On the day of Karla's death, Gomez stated she was driving around talking to the children when she noticed Karla was no longer responding. The police arrived at that time and the call ended.

### First Police Interview

The second interview occurred at the scene shortly after the police arrived. In this interview Gomez admitted she was staying with a friend (Jaime) for a few weeks because there was a problem in her apartment. In a rambling interview Gomez said Karla was showing signs of being sick (vomiting, general weakness and poor balance), so she tried to contact Karla's mother. Gomez said the mother was going to send her a letter so she could obtain medical care for the girls. Gomez finally spoke with the mother and again asked for a letter. The mother said she needed money, so Gomez sent her money but still had not received the letter. Gomez claimed she called a lawyer to try and rectify the problem. The lawyer apparently told her to take Karla to the doctor.

When asked about Karla, Gomez said she had been vomiting intermittently for about a month. Gomez eventually concluded Karla had worms in her stomach. For a while Karla appeared to be feeling better, and she ate some food. Gomez bought some medicine for the worms. Around 4:00 p.m. that afternoon Gomez noted Karla was not responding. Gomez checked Karla and determined she had died. Gomez called her mother. Gomez said she did not call an ambulance because she was afraid she would go to jail, or would lose the girls. Gomez's mother and Jaime told Gomez to call an ambulance. Gomez claimed she did not because she was thinking about herself. Gomez

5.

eventually called her uncles in Los Angeles who drove to Bakersfield. She called the emergency operator when her uncles arrived.

### *Second Police Interview*

Finally, Gomez's interview with the investigating detective (Detective Josh Finney) was played for the jury. As relevant to Karla's death, Gomez stated at times she thought Karla was faking being sick to get attention, but at other times she was actually sick. She stated she had not taken Karla to see a doctor because she was trying to contact the children's mother. She spoke with the mother on one occasion and told her Karla was sick and the mother needed to send a letter giving Gomez authority to take the children to the doctor. The mother asked for money ($100) and said she would send the letter. Gomez never received the letter.

Gomez said she thought she might have been negligent in her care for the children because she failed to obtain medical care for Karla. The symptoms displayed by Karla as described by Gomez included difficulty with her balance, vomiting, disobeying Gomez, throwing herself on the ground when around others, resulting in hitting her forehead, a seizure, and a soft spot on her head.

When asked if there was anything she felt she had done wrong other than failing to obtain medical care for Karla, Gomez admitted she had hit Karla and tied her hands twice because Karla would pull her hair repeatedly. She also admitted that on one occasion while riding in the car she had tied Karla's hands and feet for four hours because Karla was kicking. Gomez used clothing when she tied up Karla. Gomez admitted getting angry with the children because Karla always seemed to be sick when she was around other people, and Gomez thought she was trying to get attention. Gomez also said she would get very upset and frustrated with Karla when her personality changed, which might have occurred because she was sick. She admitted she sometimes lost control of her temper.

6.

Gomez admitted she knew the right thing to do was call for an ambulance when she discovered Karla was not breathing, but "I just couldn't do it." Later she admitted she did not call for help because she thought she would be arrested. She also stated she had a feeling Karla would die.

When asked about any event that might have contributed to Karla's death, Gomez stated Karla fell many times hitting her forehead and fell one time apparently attempting to exit the bathtub. Gomez also admitted she threw Karla into the back seat of the car on one occasion, and shook Karla hard on two occasions. Gomez initially did not think anything she did contributed to Karla's death, but then suggested that perhaps when she shook Karla she contributed to her death. Gomez felt that Karla may have injured herself when she fell out of the bathtub onto her head, which happened about a month before her death. Karla's head was soft and swollen after that, and it appeared a piece of her skull was displaced.

### Defense Evidence

Rhonda Gomez lived in the apartment adjacent to Gomez's apartment during the relevant time period. She saw Gomez in passing and at times with the children. The children appeared to be happy and well cared for, and Gomez appeared to be kind and patient with the children.

Gomez testified in her defense. As relevant here, she testified she obtained custody of the children when their mother, Yesenia Garcia, decided to go to Mexico at the end of June 2013. Garcia was supposed to be gone for only two weeks. When Gomez picked up the children in Los Angeles, they appeared happy and healthy.

Gomez and the children initially lived in Gomez's apartment. Gomez's boyfriend at the time, Jorge Morales, would come to the apartment occasionally. At times Morales would help with the children.

Gomez and the children eventually moved to Maria Pantoja's home because of a problem with her apartment. The children were treated well and ate with the family.

7.

Gomez testified about the incident where Karla fell out of the bathtub, which occurred in late July or early August. Gomez explained she had left Karla in the bathtub while she went into the kitchen to check on something cooking on the stove. She returned to the bathroom when she heard Morales call her name. She saw Karla stuck, head down, between the door and the bathtub. The back of Karla's head was against the bathtub. Morales was standing by the sink staring at Karla. Gomez checked Karla's head but she did not appear to be hurt.

Karla's health began to deteriorate approximately two weeks after the fall from the bathtub. The people Gomez talked to all told her it was unnecessary to take Karla to a doctor, that she would get better. Gomez and Jaime conducted research on the Internet to attempt to determine what was wrong with Karla. Gomez concluded Karla may have been hydrocephalic, dehydrated, or had stomach worms. Gomez attempted to treat the dehydration and worms. Gomez did not believe Karla would die from her injuries.

Gomez admitted tying Karla during a car trip because Karla would not stop pulling her hair. However, she denied shaking Karla, claiming she admitted doing so to the police because she was so upset she no longer cared.

### *The Verdict and Sentencing*

The jury found Gomez guilty of second degree murder and willful cruelty to a child. It also found the great bodily injury enhancement true. The trial court sentenced Gomez to a term of 15 years to life for the second degree murder count, and stayed the sentence on the child cruelty count.

## DISCUSSION

Appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 asserting she did not identify any arguable issues in the case. On February 26, 2015, we sent a letter to Gomez inviting her to identify any issues she would like this court to address. Gomez responded to our letter identifying, as we understand it, three issues she believes require reversal of the judgment.

The first issue identified by Gomez involved Juror No. 5. Shortly after testimony began in the case, the trial court received a note from this juror stating she might have some familiarity with the case as a result of her employment with child protective services. The juror was examined by the trial court and both counsel. She explained she is bilingual and is often asked to translate for other social workers when a Spanish interpreter is needed. Juror No. 5 had a vague recollection that another social worker had asked her to place a phone call to Mexico. The social worker explained the purpose of the call was to attempt to locate a child's mother. Apparently Juror No. 5 was told the mother was Spanish speaking, there was a child in custody, and a sibling had passed away while in the custody of a caretaker. Juror No. 5 also recalled the dead sibling had been found in a vehicle. Juror No. 5 placed a call and either left a message or did not speak to anyone, but was certain she did not speak to the mother. Juror No. 5 was not certain this was the same case as the one pending before the court, but was certain she did not investigate the matter and received only a brief summary of the purpose of the call.

Juror No. 5 confirmed she did not form any opinions about the matter at the time, she did not know any details about the matter, did not know how the sibling had died, and her involvement was limited to the issue of making a phone call. She also confirmed she would be able to set aside anything related to the phone call and make a decision on the evidence at trial. Without objection by either party, the trial court concluded Juror No. 5 was a fair and impartial juror and allowed her to remain on the jury. Gomez asserts Juror No. 5 should have been excused for cause.

> "The qualification of jurors challenged for cause comes within the wide discretion of the trial court, seldom disturbed on appeal. [Citation.] To find a juror is actually biased, the court must find 'the existence of a state of mind' regarding the case or the parties that would prevent the prospective 'juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' [Citations.] … '"On appeal, we will uphold the trial court's ruling if it is fairly supported by the record …."'" [Citation.]" (*People v. Rountree* (2013) 56 Cal.4th 823, 842.)

9.

The record summarized above does not provide any support for the contention that Juror No. 5 was actually biased against Gomez. She explained she had a minimal involvement in a case similar to this one, but was not sure it was actually this case. She did not learn any of the details related to the child's death, and affirmed she could base her decision on the facts before her. The trial court did not have any basis for dismissing the juror for cause.

The second issue identified by Gomez was ineffectiveness of defense counsel. Gomez asserts defense counsel failed to make proper objections, failed to introduce e-mail or text messages that would have established Gomez's good faith efforts to save Karla, and failed to call certain witnesses.[4]

A defendant is entitled to a new trial if she received ineffective assistance of counsel at trial. (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1036.)

> "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to undermine confidence in the outcome. [Citations.] [¶] Our review is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective at the time. [Citation.] A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.] … Nevertheless, deference is not abdication; it cannot shield counsel's performance from meaningful scrutiny or automatically validate challenged acts and omissions. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541.)

Gomez's assertions do not establish either prong of the ineffective assistance of counsel analysis. Gomez does not show what evidence would have been excluded if a

---

[4]We note Gomez was represented at trial by two attorneys, one male and one female, who each actively participated in her defense. Gomez's complaints appear to be directed to the male defense attorney.

proper objection was made, nor does she explain why the objection would have been proper under the law. Nor does Gomez show the relevance of the e-mail or text messages that were not introduced, and how such evidence would have affected the outcome of the trial. We note the record contains ample evidence that Gomez was worried about Karla's health, but it also shows she failed to obtain medical treatment for the child despite her concern. Finally, Gomez fails to explain what evidence would have been introduced had additional witnesses been called in her defense. Nor does the record indicate why such evidence was relevant or if it would have affected the outcome of the trial.

Our review of the record reveals defense counsel actively and competently defended Gomez in a very difficult case. Nothing in the record suggests a different outcome would have been obtained had more objections been made or additional evidence introduced. Accordingly, Gomez cannot establish defense counsel was ineffective.

Finally, Gomez asserts there is insufficient evidence she caused the death of Karla with malice aforethought.

> "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; see *People v. Staten* (2000) 24 Cal.4th 434, 460 ["An identical standard applies under the California Constitution"]; *People v. Cain* (1995) 10 Cal.4th 1, 39, overruled on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17 [same standard applies to sufficiency of the evidence to sustain special circumstance finding].) "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable

11.

doubt." (*People v. Bean* (1988) 46 Cal.3d 919, 933.) "In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment. [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529.)

We need not review the evidence at length to reject this claim. The substantial injuries suffered by Karla and Gomez's failure to obtain medical care provided ample evidence to permit the jury to infer that Gomez intentionally injured Karla, the natural and probable consequences of the act causing the injury were dangerous to human life, Gomez knew her actions were dangerous to human life, and she deliberately acted with conscious disregard for human life when she injured Karla.

Not only is there no merit to Gomez's contentions, our review of the record did not reveal any arguable issues in this case. The evidence was undisputed for the most part, especially considering the statements made by Gomez to the police investigators. Defense counsel's strategy of attempting to minimize Gomez's crime was sound, but could not overcome the overwhelming evidence to support the verdict. There was no dispute about the jury instructions, the trial court's rulings were sound, and the prosecutor argued the evidence without undue hyperbole.

## DISPOSITION

The judgment is affirmed.