Filed 10/9/20  P. v. Bentley CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B296120 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA469699) |
| v. | |
| ANTHONY TERELLE BENTLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed as modified.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Anthony Bentley of attempted murder, unlawful possession of a firearm, and assault with a firearm. The prosecution's case was premised largely on testimony from an eyewitness who identified Bentley as the perpetrator. On appeal, Bentley contends the witness's testimony was not sufficient to support the convictions and the trial court erroneously instructed the jury to consider the witness's certainty when evaluating his identification testimony. Bentley also urges us to strike a prior prison term sentencing enhancement in light of Senate Bill No. 136 (2019–2020 Reg. Sess.) (SB 136). We strike the enhancement and affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 2, 2018, William Simpson met up with his friend, Tyronne Taylor, who was visiting from out of town. Taylor wanted to see his grandmother, so he and Simpson drove to her house in Taylor's mother's convertible. Taylor double parked the car outside the house and went inside, while Simpson stayed in the passenger seat. The top to the convertible was down, and Taylor left the keys in the ignition.

Simpson noticed a blue GMC Suburban truck pull up directly behind the convertible. The truck's windows were down, and Simpson heard a man and a woman arguing. Simpson turned around when he heard the woman say, in a distraught tone, "oh, you gonna hit me?" Simpson saw the woman outside the truck and a man trying to grab her through the driver's side window.

Simpson later identified the man as Bentley. Although Simpson did not know it at the time, the woman was Taylor's

2

stepsister and Bentley's fiancé, Shanteakka Henry.  Simpson had never met Bentley or Henry before.

Simpson watched as Henry walked up the driveway towards Taylor's grandmother's house, as if she were fleeing the situation.  Henry had several young children with her.  Bentley initially followed them, but then returned to his truck and appeared to grab something.  Bentley ran back towards the house.  Simpson was concerned for the children's safety and started to dial 911 on his phone.

Bentley walked back down the driveway away from the house, and a bald man who was standing in the street motioned in Simpson's direction.  Bentley walked over to the passenger side of the convertible, about a foot from where Simpson was sitting.  He leaned over the car in an aggressive manner, with his eyes wide open, scanning the interior.  Bentley was holding in his right hand a black revolver with gold trim.  The revolver was outside Bentley's clothing, but pressed up against his body at his waistband.  The gun was about a foot from Simpson's face.

Bentley said, "Who the fuck are you?  I don't know you. I ain't never seen your ass here.  Who the fuck you here for?" Simpson responded, "I don't know what's going on.  I'm just here—like, the homie seeing his grandma. . . .  I'm not gonna do none of this."

Bentley walked back to his truck and drove it about three houses in front of the convertible.  He double parked the truck, such that it was partially blocking the street.  Bentley got out of the truck and stood next to the driver's side door.  He was talking to the bald man, who was still standing in the street.

Simpson texted Taylor and said they needed to leave because "shit is going down out here." Taylor called Simpson and told him to just drive away. Taylor's tone of voice was urgent.

Simpson slid over into the driver's seat of the convertible. He decided it would be safer to drive forward instead of attempting to turn the car around. Simpson started driving the car slowly towards Bentley and the bald man. Bentley was on the right side of the street, and the bald man was on the left side of the street. Simpson made eye contact with Bentley as he passed by, and he heard Bentley say "motherfucker" in an aggressive tone.

Simpson looked forward and a few seconds later heard three gunshots in quick succession. He heard one bullet pass by his ear and another bullet ricochet off the convertible. Simpson looked in his rearview mirror and saw Bentley holding a gun. Simpson ducked and accelerated the convertible.

After the incident, Simpson noticed a scrape on the convertible's trunk that he assumed was caused by a bullet. There was also a bullet hole in the rear panel of the car close to the right rear tire, which was flat. A tire installer subsequently found a bullet fragment in the tire. All of the damage to the convertible was consistent with the bullets having been fired from the right side of the vehicle.

Simpson reported the incident to police and identified Bentley in a six-person photographic lineup. During the subsequent investigation, a police officer observed Bentley open the door to a blue GMC truck. Bentley was the pending registered owner of the vehicle.

4

Bentley was charged by information with attempted murder (Pen. Code, §§ 664, 187, subd. (a); count 1),[1] possession of a firearm with a prior violent conviction (§ 299000, subd. (a)(1); count 2), and assault with a firearm (§ 245, subd. (a)(2); count 4). It was further alleged that Bentley had previously suffered five strike convictions (§§ 667, subd. (d), 1170, subd. (b)), two serious felony convictions (§ 667, subd. (a)(1)), and five prison term convictions (§ 667, subd. (b)). In addition, firearm enhancements were alleged as to counts 1 and 4 (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c)).

At trial, the prosecution established the facts summarized above primarily through testimony from Simpson. The prosecution also called Shanteakka Henry as a witness. According to Henry, on the day of the shooting, she and Bentley were having a discussion in his blue GMC vehicle, which was parked outside her grandmother's house. She was upset and Bentley was stressed. Henry went inside her grandmother's house for a few minutes. When she returned, Bentley was standing next to the vehicle. She and Bentley got inside the vehicle and drove away.

The defense sought to impeach Simpson by highlighting inconsistencies in his statements about the incident. For example, at trial, Simpson initially testified that he did not "necessarily see anything in [Bentley's] hand" immediately after hearing gunshots. Later, Simpson clarified that he saw Bentley holding the gun for a "split second." Simpson further testified that Bentley was on the right side of the street, and the bald man was on the left side. At the preliminary hearing, however,

_____

[1] All further undesignated statutory references are to the Penal Code.

5

Simpson testified that Bentley and the bald man were both on the left side of the street. He also could not recall seeing a gun between the time Bentley said "motherfucker" and the time he "heard gunshots" and "drove off."

The defense further pointed to Simpson's somewhat inconsistent descriptions of the shooter. During a 911 call, Simpson described the shooter as "probably" six feet tall, with "grayish hair" and a Jheri curl hairstyle. Simpson later told a police officer Bentley was around six feet two inches tall with black hair. At trial, Simpson said he was mistaken about the Jheri curl hairstyle, but he recalled Bentley having longer hair that came out the back of a hat.

The jury found Bentley guilty as charged and found true the firearm allegations. At a subsequent bench trial, the court found true the prior conviction allegations.

The trial court imposed an aggregate term of 58 years to life, calculated as follows. On count 1, the court imposed a 27-years-to-life term, consisting of the high term of nine years tripled because of the prior strikes. On count 2, the court imposed a concurrent six-year term, consisting of the high term of three years doubled because of the prior strikes. The court imposed an additional 20-years-to-life term for the firearm enhancement (§ 12022.5, subd. (c)), two five-year terms for the serious felony conviction enhancements (§ 667, subd. (a)), and a one-year term for the prior prison term enhancement (§ 667, subd. (b)). Pursuant to section 654, the court stayed the sentence on count 4 and the section 12022.5, subdivision (b) firearm enhancement.

Bentley timely appealed.

## DISCUSSION

## I.   Substantial Evidence Supports the Convictions

Bentley contends there is insufficient evidence to support his convictions.  In particular, he argues there is not substantial evidence identifying him as the shooter.  We disagree.

### A.   Standard of Review

When an appellant challenges the sufficiency of evidence supporting a jury's verdict, the reviewing court examines whether there was substantial evidence, considered as a whole, to permit a reasonable trier of fact to find the defendant guilty of the charged crime beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; see *People v. Smith* (2014) 60 Cal.4th 603, 617; *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  The court's standard for determining what is "substantial evidence" is whether the evidence is "credible and of solid value."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  One witness's testimony can be sufficient evidence to sustain a conviction.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The reviewing court presumes every fact the jury could have reasonably deduced from the evidence in support of the judgment.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213; see *People v. Lewis* (1990) 50 Cal.3d 262, 277.)  " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Staten* (2000) 24 Cal.4th 434, 460.)  Therefore, the reviewing court will not reverse a judgment for insufficient evidence unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the

7

conviction].” [Citation.]’ ” (*People v. Hughes* (2002) 27 Cal.4th 287, 370.)

This standard of review applies to claims involving both direct and circumstantial evidence. “ ‘We “must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]” [Citation.] “Although it is the jury’s duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant’s guilt beyond a reasonable doubt. [Citation.]” [Citation.] Where the circumstances reasonably justify the trier of fact’s findings, a reviewing court’s conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment’s reversal. [Citation.]’ [Citation.]” (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

### B. Analysis

Here, there is substantial evidence showing Bentley fired a gun at Simpson with the intent to kill him. Simpson testified that, on the day of the shooting, he saw Bentley in a blue GMC Suburban truck parked outside his friend’s grandmother’s house. Bentley and a woman were arguing, and Bentley was acting aggressively towards her. When Bentley noticed Simpson sitting in a nearby convertible, he threatened Simpson with a gun. Simpson drove past Bentley a few minutes later and heard him say “motherfucker” in an aggressive tone. A few seconds later, Simpson heard three gun shots and a bullet pass by his ear. He looked in his mirror and saw Bentley holding a gun.

8

Although Simpson had never seen Bentley before, he identified him as the shooter a few days later in a six-person photographic lineup. Simpson also identified Bentley at trial, explaining he recognized his distinctive face, skin tags, and mustache.

Simpson's identification and account of the shooting is corroborated by other evidence presented at trial. Bentley's fiancé, for example, confirmed that he was present at the grandmother's house, and the parties stipulated that Bentley was the pending registered owner of a blue GMC truck. In addition, the damage to the convertible indicated the bullets were fired from the right side of the vehicle, which is where Simpson testified Bentley had been standing moments before the shooting. From this, the jury could have reasonably inferred Bentley was the shooter, even if Simpson had not seen him with a gun immediately after hearing gunshots.

Considering the entire record in the light most favorable to the verdict, there is sufficient evidence from which the jury could find Bentley guilty of the charged crimes. Indeed, Simpson's testimony alone provides substantial evidence supporting the convictions.[2] (See *People v. Young*, *supra*, 34 Cal.4th at p. 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"]; *People v. Reed* (2018) 4 Cal.5th 989, 1006 ["identification of defendant by a single eyewitness may be

---

[2] Simpson's testimony did not establish that Bentley had suffered a prior violent conviction, which is required to show unlawful possession of a firearm under section 29900, subdivision (a)(1). The parties, however, stipulated at trial that Bentley had suffered such a conviction.

sufficient to establish, beyond a reasonable doubt, defendant's identity as perpetrator of the crime charged"].)

We are not persuaded by Bentley's various arguments as to why we should disregard Simpson's testimony. Bentley contends, for example, Simpson's identification was unreliable because he was under considerable stress, did not have a sufficient opportunity to observe the shooter's face, and first identified Bentley several days after the shooting. Bentley also points to inconsistencies between Simpson's trial testimony and his prior statements about the incident, including inconsistencies regarding Bentley's facial features and hair, the location where Bentley was standing, and whether Simpson saw Bentley with a gun during or after the shooting.

While these circumstances may have provided reasons for the jury to be skeptical of Simpson's testimony, they do not render it physically impossible, obviously false, or otherwise inherently improbable such that we may reject it. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 627 [" ' " 'To warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' "].) Any contradictions or other weaknesses in Simpson's testimony were "matters to be explored on cross-examination and argued to the trier of fact." (*People v. Robertson* (1989) 48 Cal.3d 18, 44.) They went to Simpson's credibility and the weight of his testimony, which were issues for the jury alone to determine. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Brown* (2014) 59 Cal.4th 86, 106.)

10

We further reject Bentley's contention that the circumstances of the photographic lineup were impermissibly suggestive and rendered unreliable Simpson's identification of Bentley as the shooter. To the extent Bentley is asserting evidence of the identification should have been excluded, he has forfeited the point by failing to make a specific and timely objection at trial. (See *People v. Medina* (1995) 11 Cal.4th 694, 753 ["Defendant asserts the identification procedure was unduly suggestive and unreliable [citations], but his failure to object waived the point"].) Any other arguments related to the identification procedures concern the weight of the evidence, which is a matter within the exclusive province of the jury. (See *People v. Rodriguez* (1970) 10 Cal.App.3d 18, 31 [a defendant may offer evidence that a pretrial identification procedure was unfair, which affects the weight of the identification].)

## II. The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 315

Without objection, the trial court read to the jurors CALCRIM No. 315, which instructed them to consider numerous questions while evaluating eyewitness identification testimony. One of those questions is "How certain was the witness when he made an identification?" Bentley contends this instruction was erroneous because the scientific and academic communities have reached a consensus that an eyewitness's certainty does not correlate with accuracy. We disagree.

Initially, the Attorney General contends Bentley forfeited this issue by failing to request the trial court modify CALCRIM No. 315 to delete the reference to the certainty factor. Bentley concedes he did not raise the issue below, but he insists it was

not necessary because the trial court had a sua sponte duty to modify the instruction. We agree with the Attorney General.

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), the California Supreme Court found forfeiture under similar circumstances. In that case, the defendant argued the trial court erred by instructing the jury that, when evaluating the accuracy of an eyewitness identification, it could consider " 'the extent to which the witness is either certain or uncertain of the identification.' " (*Id*. at p. 461.) The Supreme Court concluded the defendant forfeited the claim by failing to request a modification, explaining "[i]f defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so." (*Ibid*.) The same is true here. Bentley's failure to object and request modification of CALCRIM No. 315 has forfeited the issue on appeal.

Even if we overlooked Bentley's forfeiture, we would reject his claim on the merits. The California Supreme Court has repeatedly held a jury may consider an eyewitness's certainty when evaluating his or her identification. (See *Sánchez, supra*, 63 Cal.4th at p. 462; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232; see also *People v. Wright* (1988) 45 Cal.3d 1126, 1141, 1166.) Although it appears the Supreme Court is poised to reexamine the issue in connection with its review of *People v. Lemcke*, review granted October 10, 2018, S250108, until it does so, we are bound by existing Supreme Court precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].) Accordingly, we reject Bentley's contention that the trial court

12

erred by instructing the jury to consider a witness's certainty when evaluating identification testimony.[3]

Even if the instruction were erroneous, any error was harmless. (See *Sánchez, supra*, 63 Cal.4th at p. 463 [a claim that the trial court erred in giving an instruction on witness certainty is subject to a harmless error analysis].) Bentley contends the instruction was prejudicial because it misled the jury into believing Simpson's certainty made his identification accurate.[4] However, as was the case in *Sánchez*, the instruction here was presented in a neutral manner that did not suggest certainty equals accuracy. (See *Sánchez, supra*, 63 Cal.4th at p. 462.) Nor did the prosecution argue that point to the jury. In fact, the only reference to the certainty factor came during Bentley's closing argument, when his counsel argued "there's a difference between accuracy and certainty. [¶] Mr. Simpson is certain, but he's not being accurate."

In any event, we have no doubt the jury would have convicted Bentley even without Simpson's direct identification. As Bentley concedes, there was no real dispute that he was present at the scene of the shooting along with his blue GMC truck. Indeed, Bentley's fiancé testified that he arrived at the grandmother's house in a blue GMC truck, and Bentley stipulated to being the pending registered owner of such a

---

[3] Because we find no instructional error, we reject Bentley's derivative argument that the instruction violated his constitutional rights. (See *People v. Avila* (2006) 38 Cal.4th 491, 596 ["Because we find no instructional error, defendant's claim of federal constitutional error must fail."].)

[4] Simpson testified Bentley was "definitely" the man who "was involved in the incident."

13

vehicle. The primary question for the jury to decide, therefore, was whether it was Bentley, or some other person who was also present, who fired the shots at Simpson.

On this point, Simpson's identification of Bentley supported the prosecution's case, but it was far from essential. None of the testifying witnesses directly observed the shooting, meaning the jury must have relied on circumstantial evidence to convict Bentley. That circumstantial evidence consisted primarily of Simpson's testimony that, shortly before the shooting, a man had threatened him with a gun, called him a "motherfucker," and was standing in the area from which the shots appeared to have been fired. Because Simpson was consistent that this same man arrived at the grandmother's house in a blue GMC truck, the only reasonable inference is that the man Simpson observed is Bentley. This is true even without Simpson's direct identification.

Given the jury clearly believed Simpson's testimony recounting the circumstances surrounding the shooting, we have no doubt it would have convicted Bentley, even if it had given no weight to Simpson's identification. Accordingly, any instructional error related to the identification was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## III. Bentley's Section 667.5, Subdivision (b) Sentence Enhancement Must be Stricken

Bentley contends, and the Attorney General concedes, the one-year sentence enhancement imposed under section 667.5, subdivision (b), must be stricken. We agree.

14

Prior to January 1, 2020, a one-year sentence enhancement under section 667.5, subdivision (b), was mandatory " 'for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 889.) The only exception was for defendants who remained free for five years of both prison custody and the commission of a new offense resulting in a felony conviction. (*Ibid*.) In October 2019, the Legislature passed SB 136, which amended section 667.5, subdivision (b), to eliminate the prior prison term enhancement except in cases involving sexually violent offenses. SB 136 became effective on January 1, 2020. (Cal. Const., art. IV, § 8, subd. (c)(2).)

Because Bentley's conviction is not yet final and his prior conviction is not for a sexually violent offense, SB 136 applies retroactively to his sentence. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 [SB 136 applies retroactively to all cases not yet final as of its effective date]; *In re Estrada* (1965) 63 Cal.2d 740, 748 [for a non-final conviction, "where the amendatory statute mitigates punishment and there is no savings clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"]; *People v. Vieira* (2005) 35 Cal.4th 264, 306 [" 'for the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed' "].) As a result, the one-year enhancement imposed under section 667.5, subdivision (b), must be stricken. Further, we agree with the Attorney General that we need not remand the matter for resentencing given the trial court imposed

15

the maximum possible sentence.  (See *People v. Buycks, supra,*
5 Cal.5th at p. 896, fn. 15 [no need to remand for resentencing
where trial court imposed maximum possible sentence regardless
of whether an enhancement was stricken].)

## DISPOSITION

The one-year section 667.5, subdivision (b) enhancement is
stricken.  We affirm the judgment in all other respects.

The trial court is directed to prepare an amended abstract
of judgment consistent with this opinion and forward a certified
copy of the amended abstract of judgment to the Department of
Corrections.


BIGELOW, P. J.

WE CONCUR:


GRIMES, J.


STRATTON, J.


16