Filed 11/17/22  P. v. Stewart CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B314146 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. A364692 |
| v. | |
| CARLETHA ANN STEWART, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark K. Hanasono, Judge. Affirmed.

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 1980, defendant and appellant Carletha Stewart planned the robbery of a Bob's Big Boy Restaurant that resulted in the execution-style murder of four people in the restaurant's walk-in freezer. Stewart pled guilty to numerous crimes, including four counts of first degree murder. In 2019, Stewart filed a petition for recall and resentencing under former Penal Code section 1170.95.[1] After conducting an evidentiary hearing, the trial court denied her petition, concluding beyond a reasonable doubt she was a major participant in the robbery underlying her murder convictions who acted with reckless indifference to human life. On appeal, Stewart argues the trial court's determination is unsupported by substantial evidence. We affirm.

## PROCEDURAL BACKGROUND

In 1983, Stewart pled guilty to four counts of first degree murder (§ 187, subd. (a)), eight counts of robbery (§ 211), seven counts of assault with a deadly weapon (§ 245, subd. (a)), and one count of conspiracy to commit robbery (§ 182). The trial court sentenced her to 25 years to life in state prison.

In 2019, Stewart filed a petition for resentencing under section 1172.6. The trial court appointed counsel on Stewart's behalf, issued an order to show cause, and ordered an evidentiary hearing. After conducting the evidentiary hearing, the trial court

---

1    All undesignated statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. All further references to the statute will be to the new section number.

issued a written order denying relief, concluding the prosecution had proven beyond a reasonable doubt Stewart was a major participant in the robbery who acted with reckless indifference to human life.

Stewart timely appealed.

## FACTUAL BACKGROUND[2]

### A. After being fired from a Bob's Big Boy Restaurant, Stewart threatened to cool off the manager "in the freezer"

In 1980, Stewart worked as a waitress at a Bob's Big Boy Restaurant on La Cienega in Los Angeles ("the restaurant"). She was fired and subsequently attempted to sue the restaurant. Later that year, Stewart came to the restaurant to try to get her job back. Rodell Mitchell was a night manager who had previously supervised Stewart. He told her he would not rehire her.

Stewart sat at the counter and joked with her friend, another waitress, Brenda Givens. Mitchell believed Stewart was trying to aggravate him. He told her she had to leave because she was distracting Givens from her work, and she could only stay if she was a customer. Stewart went behind the counter, where only employees were supposed to go. When she retrieved crackers, Mitchell asked her to stop and said she had to pay for them. She replied he would have to make her. Mitchell said he would throw her out. Stewart replied in a "joking sense" that she would "take

---

2    The following information is taken from the preliminary hearing of Stewart and one of her accomplices, Ricky Sanders, as well as from Stewart's guilty plea and sentencing hearing.

[him] in the freezer and cool [him] off." He remembered the incident only because he later learned people were killed in the freezer.

## B. Stewart attempted to recruit others to rob the restaurant

In August 1980, Stewart, Bruce Woods, and a person identified as "Connie" were driving in a car. Stewart said "she had it set up" to rob the restaurant and asked if Woods and Connie would like to help. It sounded to Woods like Stewart "had the whole thing planned." She needed someone to "take down Bob's." She did not want to rob it herself because the employees knew her, but she said she would tell them where everything in the restaurant was. Woods and Connie declined to help.

## C. Stewart warned Givens not to go to work to avoid getting hurt during a robbery, then attempted to rob the restaurant with Freeman and Sanders

In September 1980, Givens (Stewart's friend who worked at the restaurant) went to the county jail to visit her boyfriend. She saw Stewart there. Stewart said she was glad to see Givens. When Givens asked why, Stewart said, "Because they are going to rob Bob's tonight and I don't want you hurt." Givens did not inquire further. Givens went to work and told her coworkers, including her manager Mitchell, what Stewart told her about the robbery. She told Mitchell someone might be hurt.

Andre Gilchrist went to Stewart's house that night and discussed robbing the restaurant with Stewart. Gilchrist had known Stewart for many years, and they had previously been in a relationship. When Gilchrist arrived at Stewart's house, Stewart asked him if he would tell anyone what she told him, and he said

4

he would not. Stewart told him that Franklin Freeman (Stewart's cousin) and Ricky Sanders (Stewart's boyfriend) were going to rob the restaurant that night at closing time. She "told them what time to go," where the money was kept, and that there were two safes in the restaurant. She said that she told Freeman and Sanders about the "inside workings" of the restaurant. Stewart tried to call Freeman, but she could not reach him.

Stewart then drove herself and Gilchrist to the restaurant. On the way there, Gilchrist got "the shakes." They noticed that the streets near the restaurant were blocked by the police. An unrelated murder had occurred in the area. They arrived at the restaurant and sat inside, drinking coffee. Gilchrist thought the robbery was not going to occur until later in the evening, after they left.

Stewart asked the waitresses who was working, how many managers were there, and who would be there during closing. They had been at the restaurant for about 45 minutes when Stewart got up and said she was going to call Freeman. Stewart wondered about Freeman and Sanders's whereabouts. She worried they had been caught. Mitchell, the restaurant's manager, saw her get up to use the phone multiple times. Givens was also working at the restaurant that night.

At some point, police came into the restaurant to inquire about the unrelated murder that was being investigated nearby. Mitchell informed them of Stewart's statements to Givens, but the police did not act on his complaint because of their other investigation.

Gilchrist and Stewart left when the restaurant was being closed, around 1:30 a.m. Twenty minutes after they left, Stewart

called Givens at the restaurant and asked her when she was going to leave. Givens said she did not know.

After the restaurant had closed, Stewart came back and repeatedly asked to come inside. She made these requests in a joking manner and tugged at the door. She asked if she could take Givens home with her, and Mitchell advised Givens against it. Stewart finally left. Because the restaurant employees were afraid there would be a robbery and worried about getting hurt, they left in one big group.

Later, at Stewart's house, Gilchrist saw Stewart go outside to talk with Freeman and Sanders, who sat in the front seats of a car. Two shotguns were in the front, next to Freeman and Sanders. Gilchrist was still at Stewart's house when Stewart received a call. After the call, she told Gilchrist that Freeman and Sanders did not commit the robbery because the manager did not go outside. She said the robbery would instead be done Saturday night. Freeman and Sanders were going to go to the restaurant, wait until the manager came out, and push him back inside.

### D. In December 1980, Freeman and Sanders implemented Stewart's plan to rob the restaurant and killed four people

On December 14, 1980, around 2:00 a.m., as the restaurant was closing and customers were leaving, Freeman and Sanders rushed the door and pushed their way inside. They said that this was a "jack or a stick up." Both of the men had short-barreled shotguns. At least one shotgun had a "sawed-off" barrel. Freeman and Sanders had purchased shotguns in November, including a sawed-off shotgun.

Freeman or Sanders struck the cashier, Ahmed Mashuk, in the head with a shotgun, and Mashuk fell down. They repeatedly

6

kicked him until he was unconscious. Freeman and Sanders ordered the 11 people in the restaurant (employees and patrons) to the back. They moved the victims about 25 feet to a hallway. Some of the victims were told to lie on the floor. They were on the floor for about four minutes. Freeman or Sanders said: "Cooperate, please cooperate. We do not want to hurt you. Just lay down on the floor."

Freeman and Sanders directed the victims to go in the restaurant's walk-in freezer. One of the robbers told the manager to open the safe. The manager complied, retrieving about $500 from the safe. He was then also ordered into the freezer.

Freeman and Sanders ordered the 11 individuals in the freezer to provide their valuables. A bucket was passed around, and the valuables were collected. A few of the victims started getting "more and more scared", but none of the victims resisted or failed to cooperate.

Mashuk was "pulled" and "kicked" into the freezer. He was unconscious, lying in the freezer with his feet outside the door. Freeman and Sanders ordered him to move, but he could not. One of them pointed their gun at Mashuk and said, "Someone move him or he'll get it first."

Soon after collecting the valuables, Freeman and Sanders started shooting without warning. They fired the shotguns from a few feet away. One witness estimated 12 to 20 shots were fired. Approximately 15 to 20 minutes elapsed between when Freeman and Sanders arrived and the shots were fired.

Four people died from gunshot wounds: David Burrell, Dita Agtani, Ahmad Mashuk, and Cesario Luna. Many more were severely injured. Dionne Irvin was struck by shotgun pellets in her back, neck, and arm. At the time of trial, she was no longer

able to bend her wrist or use her fingers correctly on the arm that was shot. Evelyn Jackson was shot in the back of the head. She spent two months in the hospital and at the time of trial still suffered from double vision, other vision issues, problems with her neck, and weakness on the right side of her body. Tammy Rogoway was shot and lost feeling in her legs. At the time of trial, Rogoway still had over 100 shotgun pellets lodged into her back, and could not feel the right side of her body. Michael Mallory lost his right eye from a gunshot pellet.

When Stewart pleaded guilty to four counts of murder, she admitted that "in truth and fact [she was] the driver of the getaway car on the date of December 14, 1980, at Bob's Big Boy Restaurant at 2:00 a.m., knowing that there was a robbery to take place by at least Ricardo Rene Sanders."

## DISCUSSION

### I.    Governing Law

The Legislature enacted Senate Bill 1437 (SB 1437) "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

SB 1437 also added section 1170.95 to the Penal Code which, as mentioned above, was later renumbered to section 1172.6. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10.) This section permits individuals who were convicted of felony murder

or murder under a natural and probable consequences theory, but who could not be convicted of murder following SB 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1172.6, subd. (a).) A petition for relief under section 1172.6 must include a declaration by the petitioner that he or she is eligible for relief based on all the requirements of subdivision (a), the superior court case number and year of the petitioner's conviction, and a request for appointment of counsel, should the petitioner seek appointment. (§ 1172.6, subd. (b)(1).)

Subdivision (c) of section 1172.6 provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

"If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater

9

than the initial sentence.' ([§ 1172.6], subd. (d)(1).)" (*Lewis*, *supra*, 11 Cal.5th at p. 960.) At the hearing, the parties may rely on the record of conviction or present "new or additional evidence" to support their positions, and "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

## II.     Analysis

As Stewart acknowledges, "[o]nce the section [1172.6] proceedings have progressed to a hearing pursuant to section 1172.6, subdivision (d)(3), the appellate courts have agreed that the trial court's factual findings at that hearing should be reviewed for substantial evidence. [Citations]." Despite acknowledging this consensus, Stewart "believes the correct standard is independent review." We disagree with Stewart and decline her invitation to depart from the well-established substantial evidence standard. (See, e.g., *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

Alternatively, Stewart contends the trial court's finding that she was a major participant who acted with reckless indifference to human life is unsupported by substantial evidence. For reasons discussed in greater detail below, we disagree.

In assessing Stewart's argument, we review the record in the light most favorable to the judgment to determine if there is substantial evidence from which any rational trier of fact could find each element of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v.*

*Staten* (2000) 24 Cal.4th 434, 460.) Substantial evidence is evidence that is "'reasonable in nature, credible, and of solid value.' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Substantial evidence includes circumstantial evidence and reasonable inferences based on that evidence. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.) In reviewing a sufficiency claim, we "presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.)

In *People v. Banks* (2015) 61 Cal.4th 788, our Supreme Court provided a non-exhaustive list of factors relevant to determining whether an individual was a "major participant" in an underlying felony, including: (1) the defendant's role in planning the criminal enterprise that led to death; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of the dangers posed by the nature of the crime, the weapons used, or the past experience with the other participants; (4) whether the defendant was present at the scene of the killing; (5) whether the defendant's actions or inactions played a particular role in the death; and (6) what the defendant did after lethal force was used. (*Id.* at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*) In determining whether a defendant was a major participant in an offense, the finder of fact must consider the totality of the circumstances. (*Id.* at p. 802.)

In *People v. Clark* (2016) 63 Cal.4th 522, (*Clark*), the Supreme Court expounded upon the meaning of "reckless indifference to human life," and set forth a non-exclusive list of relevant factors, including: (1) the defendant's knowledge of

11

weapons used in the crime; (2) how those weapons were used; (3) the number of weapons used; (4) the defendant's proximity to the crime; (5) the defendant's opportunity to stop the killing or aid the victim; (6) the duration of the crime; (7) the defendant's knowledge of the killer's propensity to kill; and (8) the defendant's efforts, if any, to minimize the possibility of violence during the crime. (*Id.* at pp. 616-623.) Like the *Banks* factors listed above, "'[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" (*Id.* at p. 618.) "We analyze the totality of the circumstances to determine whether [Stewart] acted with reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

We begin by analyzing whether substantial evidence supports the trial court's finding that Stewart was a major participant in the robbery. We conclude the answer is yes. As the trial court explained, in addition to being the getaway driver, Stewart was integrally involved in the planning of the takeover robbery of the restaurant. She told friends she had "set up" the robbery and tried to recruit them to participate in the conspiracy. In the months leading up to the robbery, she provided her co-conspirators with knowledge about the restaurant's workings and layout. She and her co-conspirators also attempted a similar robbery at the same restaurant two months before the robbery that gave rise to her murder convictions. When the robbery did occur, Stewart acted as the getaway driver as her co-conspirators, armed with shotguns, entered the restaurant and relied on her information to control the victims and seek out the restaurant's safe. Based on these facts, the trial court could reasonably conclude Stewart was a major participant in the robberies.

The trial court's finding that Stewart acted with reckless indifference to human life is likewise supported by substantial evidence. As the trial court noted, the robbery Stewart planned was especially dangerous. Freeman and Sanders each had shotguns, and Stewart knew they would be armed. Stewart's plan contemplated that the gunmen would enter the restaurant right before it closed, with patrons and employees still present. The plan entailed the gunmen holding the victims at gunpoint for several minutes as they collected the victims' valuables and opened the safe. It is notable that Stewart warned off one of her friends who worked at the restaurant because she did not want that friend to be put in harm's way when the robbery occurred. This warning shows Stewart knew the robbery victims might get hurt. Stewart also threatened a manager at the restaurant whom she disliked, saying she would cool him off "in the freezer," providing evidence that she may have known her co-conspirators would hold and possibly harm the robbery victims in the freezer. And lastly, the robbery itself was unnecessarily violent from beginning to end. It started with the gunmen beating the cashier unconscious without warning and ended with them shooting the victims in the freezer. The trial court could reasonably infer that Stewart, as one of the robbery's principal planners, knew the gunmen were going to carry out the robbery in an unnecessarily violent manner.

Stewart additionally argues principles of res judicata and collateral estoppel bar the prosecution from relitigating her intent to have the murders committed. This argument is inapposite. The trial court did not deny Stewart relief based on a finding of intent to kill. Indeed, the court expressly declined to decide whether Stewart harbored an intent to kill, instead

13

denying relief based on its conclusion that she was a major participant who acted with reckless indifference to human life. We therefore need not address this argument further.

## DISPOSITION

The order denying Stewart's section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J.

We concur:

MANELLA, P.J.

COLLINS, J.

14